**DYNALANTIC CORP., Appellant,**

v.

**DEPARTMENT OF DEFENSE,**
et al., Appellees.

No. 96–5260.

United States Court of Appeals,
District of Columbia Circuit.

Argued April 18, 1997.

Decided June 10, 1997.

Daniel E. Johnson, Washington, DC, argued the cause for appellant, with whom Michael T. Janik was on the brief.

Daniel F. Van Horn, Assistant U.S. Attorney, Washington, DC, argued the cause for appellees, with whom Eric H. Holder, Jr., U.S. Attorney, John D. Bates and R. Craig Lawrence, Assistant U.S. Attorneys, were on the brief.

Before EDWARDS, Chief Judge, SILBERMAN and WILLIAMS, Circuit Judges.

Opinion for the Court filed by Circuit Judge SILBERMAN.

Dissenting opinion filed by Chief Judge HARRY T. EDWARDS.

SILBERMAN, Circuit Judge:

Dynalantic Corporation sued the Department of Defense and the Small Business Administration seeking to enjoin the procurement, under the government's so-called 8(a) contract set-aside program, of a flight simulator contract for which Dynalantic wished to bid. The district court held that Dynalantic did not have Article III standing. We reverse.

## I.

The Small Business Act sets a "Government-wide goal" that "not less than 5 percent of the total value of all prime [federal] contract and subcontract awards for each fiscal year" be awarded to socially and economically disadvantaged small business concerns. 15 U.S.C. § 644(g)(1) (1994). The Small Business Administration (SBA), under § 8(a) of the Act, is authorized to contract with other government agencies to provide goods and services, and then to subcontract that work to qualifying businesses. The Department of Defense has its own 5% goal, which it may satisfy by participating in the 8(a) program. See 10 U.S.C.A. §§ 2323(a), 2323(e)(3) (Supp.1997).

Qualifying businesses must be both "small," as defined by the statute, and 51% owned (and controlled) by individuals who are both "socially and economically disadvantaged." "Socially disadvantaged" individuals are defined as those persons who have been "subjected to racial or ethnic prejudice or cultural bias because of their identity as a member of a group without regard to their individual qualities." 15 U.S.C. § 637(a)(5) (1994). SBA regulations presume that, "[i]n the absence of evidence to the contrary," members of certain racial or ethnic groups— including Black, Hispanic, Native, Asian Pacific, and Subcontinent Asian Americans— are socially disadvantaged. 13 C.F.R. § 124.105(b)(1) (1997). A person not a member of a listed group may still qualify as socially disadvantaged by demonstrating, "on the basis of clear and convincing evidence," that he or she personally suffers from social disadvantage which stems from color, ethnic origin, gender, physical handicap, long-term residence in an environment isolated from mainstream American society, or other similar cause; is rooted in treatment experienced in American society; is chronic and substantial; and has negatively impacted the individual's entry into and/or advancement in the business world. Id. § 124.105(c)(1).

The Act in turn defines the "economically disadvantaged" as "those socially disadvantaged individuals whose ability to compete in the free enterprise system has been impaired due to diminished capital and credit opportunities as compared to others in the same business area who are not socially disadvantaged." 15 U.S.C. § 637(a)(6)(A). The SBA, in applying that standard, looks at an individual's personal income for at least the past two years, the total fair market value of all his assets, and his personal net worth. Under SBA regulations, individuals with a personal net worth exceeding $250,000 cannot initially qualify as economically disadvantaged, and an individual is ineligible for continued participation in the 8(a) program (participation is limited to a maximum of nine years) if the individual's net worth exceeds $750,000. See 13 C.F.R. §§ 124.106(a)(2)(i), 124.111(a)(2).

In February 1995, the SBA requested that a contract for the development for the Navy of the UH–1N Aircrew Procedures Trainer (APT)—a mobile flight simulator for the UH–1N "Huey" helicopter—be awarded through the 8(a) program.[1] Dynalantic, a small company that has designed and manufactured flight simulators for the military, filed an administrative protest with the contracting officer, contesting the decision to award the APT under the 8(a) program. The protest and a subsequent administrative appeal were rejected, and thereafter Dynalantic filed a complaint in district court seeking declaratory and injunctive relief, claiming that the government's decision to procure the APT contract under the 8(a) program was unconstitutional under the Fifth Amendment and violated the Administrative Procedure Act.

The district court denied Dynalantic's motion for a preliminary injunction. The district court thought Dynalantic lacked standing to challenge the constitutionality of the 8(a) program and that Dynalantic had failed to meet the requirements for a preliminary injunction. *Dynalantic Corp. v. United States Dep't of Defense*, 937 F.Supp. 1, 9 (D.D.C.1996). The court subsequently dismissed the entire case. Dynalantic appealed both the denial of its motion for a preliminary injunction and judgment for the government on the pleadings. On October 7, 1996, we dismissed the appeal of the denial of the preliminary injunction as moot, given the dismissal of the entire action, and on January 24, 1997, we granted Dynalantic's motion to enjoin the APT procurement during the pendency of the appeal. Only a few weeks later, after Dynalantic had filed its initial appellate brief, the Navy canceled the proposed solicitation for the APT procurement.

## II.

After canceling the proposed procurement, the government suggested that the case had become moot because there was "*currently no plan* to procure the APT through the 8(a) program or by any method involving race-conscious elements." (Emphasis added.) Since the government bears "the *heavy burden* of demonstrating that there is no reasonable expectation that the alleged violation will recur," *Payne Enters., Inc. v. United States,* 837 F.2d 486, 492 (D.C.Cir.1988) (quotations and citations omitted), we directed the government to give us further information. The government submitted an affidavit from the Director of the Aircraft Support Contracts Department, Naval Air Systems Command, who explained that the decision to withdraw the APT procurement from the 8(a) program was made because "[t]he delay caused by the pending litigation involving the [APT] procurement has led to both operational and safety concerns" (the UH–1N is the only Marine Corps aircraft for which no simulator is presently available for training), and because further delays might jeopardize the funding for the APT. The government assured us, however, that although the exact manner of the APT procurement had yet to be determined, "neither the 8(a) program nor any other race-conscious source selection procedure will be used as part of the new procurement plan." The government therefore argues that because Dynalantic's claims, both before the district court and on appeal, have been directed at the APT procurement specifically, the government's decision to withdraw the APT procurement from the 8(a) program leaves no controversy between it and Dynalantic. Any decision from us would be an advisory opinion because Dynalantic is now able to compete for the APT contract—precisely the remedy it has sought throughout this litigation.

Dynalantic is not content with the government's assurances, perhaps perceiving its

---

1. The SBA may award contracts either through competitive bidding or "sole source" procurement, in which the SBA selects a specific participant for a sole source award in order to aid the firm's business development plan, or where the procuring agency suggests the firm as a qualified company. *See* 13 C.F.R. § 124.308. Where a contract's price is anticipated to exceed $3 million ($5 million for certain manufacturing contracts), and there is a reasonable expectation that at least two 8(a) participants will submit fair market offers, the contract must be opened for competitive bidding among all eligible 8(a) participants. *See id.* § 124.311. Because the APT contract met these requirements, the Navy offered, and the SBA accepted, the APT procurement on a competitive basis, but only among eligible 8(a) companies.

specialty, constructing simulators, as particularly vulnerable to the 8(a) set-aside program. *See infra* pp. 1017–1018. It claims that its appeal qualifies for both of the exceptions to the mootness doctrine: "the common one for 'actions capable of repetition yet evading review,' and the related but narrower one addressing a defendant's voluntary cessation of the offending conduct." *Clarke v. United States,* 915 F.2d 699, 703 (D.C.Cir.1990) (en banc). The case is capable of repetition yet evades review, it is argued, because the government plans to continue to set aside simulator procurements under the 8(a) program, and presumably can evade review by withdrawing particular procurements from the program whenever it is seriously challenged. Alternatively, Dynalantic contends that the government, by withdrawing the APT procurement from the 8(a) program, has "manipulat[ed] the judicial process by voluntarily ceasing the complained of activity, and then seeking a dismissal of the case, thus securing freedom to return to [its] old ways." *Clarke,* 915 F.2d at 705 (quotations and citations omitted).

■ We need not decide, however, whether appellant's APT claim would fall within one of these exceptions because we grant Dynalantic's alternative request that we allow it to amend its pleadings to raise a general challenge to the 8(a) program as administered by the SBA and participated in by the Defense Department. Although we are normally hesitant to allow a plaintiff resisting a mootness claim later to assert broader claims of injury, *see, e.g., Clarke,* 915 F.2d at 703, here it is the government's own actions, taken after Dynalantic had litigated the case below—indeed, after we enjoined the APT procurement pending appeal—that made Dynalantic's claims regarding the APT procurement arguably moot. Moreover, although Dynalantic's complaint was directed only at the APT procurement, the parties briefed the constitutionality of the 8(a) program below (albeit in the context of the APT procurement), the district court considered the constitutionality of the 8(a) program in denying the preliminary injunction, *see Dynalantic,* 937 F.Supp. at 9–10, and much of the government's appellate brief is directed at the constitutionality of the program. So

the government is hardly prejudiced by permitting Dynalantic to assert its broader claim. We think it only fair, given the government's switch of position after appellant had filed its opening brief, to allow Dynalantic to amend its pleadings, *cf. Swan v. Clinton,* 100 F.3d 973, 980 & n. 3 (D.C.Cir.1996) (allowing, on appeal, the addition of defendants to the complaint to avoid jurisdictional defect of redressability); *compare Fair Employment Council of Greater Washington, Inc. v. BMC Marketing Corp.,* 28 F.3d 1268, 1275 (D.C.Cir.1994), and as amended the case clearly is not moot. The government apparently intends to continue to award contracts under the 8(a) program, and Dynalantic's challenge to the program is not mooted merely because the challenge to one particular application of it may be. *See City of Houston v. Department of Housing and Urban Dev.,* 24 F.3d 1421, 1428 (D.C.Cir.1994).

### III.

■ Dynalantic asserts that it has standing to challenge the 8(a) program because it is injured by its inability to bid for contracts procured under the program. The government presents two basic arguments against Dynalantic's standing. The first argument, although put both as an attack on Dynalantic's alleged injury and also, relying on *Steffan v. Perry,* 41 F.3d 677 (D.C.Cir.1994) (en banc), as a challenge to appellant's ability to trace its injury to the alleged legal wrong, is based essentially on one notion. Because appellant has never sought an 8(a) contract nor could it qualify for such a contract even if the race-conscious elements were eliminated (since Dynalantic could not claim to be economically disadvantaged or prove itself socially disadvantaged), the government's 8(a) program causes appellant no injury. The district judge evidently accepted this argument, stating that appellant is "outside the zone of active consideration for award of the contract at issue," and relying on *Fortec Constructors v. Kleppe,* 350 F.Supp. 171, 172 (D.D.C.1972) ("plaintiffs have never sought to be eligible for the 8(a) program, and never having had an 8(a) contract to gain, they cannot now allege that a contract was lost").

We think this argument is premised on a mischaracterization of Dynalantic's alleged injury. Appellant has no desire to participate in the 8(a) program. *Cf. Regents of Univ. of Cal. v. Bakke,* 438 U.S. 265, 281 n. 14, 98 S.Ct. 2733, 2743 n. 14, 57 L.Ed.2d 750 (1978) (Opinion of Powell, J.) (not fatal to Bakke's standing that he did not seek to qualify as "disadvantaged"). Rather, Dynalantic's injury is its lack of opportunity to compete for Defense Department contracts reserved to 8(a) firms. Dynalantic alleges that "it is able and ready to bid on contracts and that a discriminatory policy prevents it from doing so on an equal basis." *Northeastern Fla. Chapter of the Associated Gen. Contractors of Am. v. City of Jacksonville,* 508 U.S. 656, 666, 113 S.Ct. 2297, 2303, 124 L.Ed.2d 586 (1993). *See also Adarand Constructors, Inc. v. Pena,* 515 U.S. 200, 209–13, 115 S.Ct. 2097, 2104–05, 132 L.Ed.2d 158 (1995); *O'Donnell Constr. Co. v. District of Columbia,* 963 F.2d 420, 423 (D.C.Cir.1992). Nor of course does Dynalantic need to demonstrate that it actually would have won (or will win) the award of a particular contract. *See Adarand,* 515 U.S. at 211–13, 115 S.Ct. at 2105 (citing *City of Jacksonville,* 508 U.S. at 666, 113 S.Ct. at 2303). Dynalantic's injury is "the inability to compete on an equal footing in the bidding process, not the loss of a contract." *City of Jacksonville,* 508 U.S. at 666, 113 S.Ct. at 2303. Dynalantic's allegation that the 8(a) program causes a not insignificant portion of its potential business opportunities to be foreclosed to it clearly makes out an injury.

For similar reasons, the government's reliance on *Steffan* is misplaced. There we said that a midshipman discharged from the Navy did not have prudential standing to challenge the alleged unconstitutional reach of the Defense Department regulations defining homosexuals since he failed to assert that he was *not* covered by the admittedly constitutional portion of the definition. *See* 41 F.3d at 698. Steffan claimed he was injured because he had been discharged from the Navy because of his status as a homosexual, but he did not claim that it was illegal for the Navy to discharge those who engaged in homosexual conduct, nor that he had not engaged in such conduct. He wished to challenge what he argued was the Navy's overbroad definition of homosexual without alleging that he was injured by that overbreadth. In other words, the claimed legal wrong was logically severable and did not—or at least was not shown to—impact Steffan. *Id.* The government claims this case is analogous because Dynalantic, as not economically or socially disadvantaged (without the presumption), could not qualify for the 8(a) program even if the race-conscious elements were removed; therefore, it is "not the illegal aspect of the action challenged that harm[s] [Dynalantic]." *Id.* at 697. Dynalantic is not an "appropriate plaintiff," *id.* at 698, to bring a case focusing on the constitutionality of the 8(a) program— a poor white contractor would be—and thus Dynalantic has not rested its claim to relief on its own rights, but the rights of others.

As should be apparent, however, this formulation of the government's argument framed as causation analysis is, like its injury argument, based on the same incorrect description of Dynalantic's injury. Dynalantic, as we have noted, does not seek to qualify for the 8(a) program, so whether it could meet the non-race-conscious requirements is wholly irrelevant. And *Steffan* rests on a different analytical framework. Appellant, unlike Steffan, claims that the *entire* 8(a) program—which injures it by foreclosing business opportunities—is infected by unconstitutional race consciousness and therefore its constitutional claim is not logically distinct from its injury.

This case *might* be logically analogous to *Steffan* if the statute created a 5% requirement rather than a goal and that requirement were race-neutral, for then the same number of contracts necessarily would be set aside regardless of the race-conscious aspects of the program, and hence Dynalantic's competitive injury arguably would not be traceable to the race-conscious portions. With simply a goal, however, we cannot assume that there would be the same number of 8(a) contractors absent the allegedly illegal provisions. Of the approximately 5,700 firms currently in the 8(a) program, only about two dozen—less than one-half of one percent—have qualified by demonstrating to the SBA by "clear and convincing evidence,"

13 C.F.R. § 124.105(c)(1), that they are socially disadvantaged; thus, over 99% of the firms qualified as a result of race-based presumptions. That means that 99% of those companies that have a preferred position to appellant in competing for Defense Department contracts received an allegedly illegal boost to put them in the preferred category. It seems more than likely that without the regulatory presumption there would be considerably fewer 8(a) contractors, for such contractors would have to make by "clear and convincing evidence" the showing required by 13 C.F.R. § 124.105(c)(1), including that the disadvantage has been *personally* felt and has impacted their entry into the business world. Appellant would thus suffer a considerably lessened injury: a smaller number of 8(a) firms means a smaller number of contracts procured under the 8(a) program.[2]

■ The government's second argument is directed at the third element of standing, redressability. Typically, redressability and traceability overlap as two sides of a causation coin, and here too the concepts are closely related. Even assuming, the argument goes, that the race-conscious portion of the 8(a) program *as presently configured* could be thought to cause appellant injury, we could only invalidate *that* element of the program, not the general statutory concept of reserving government contracts for those regarded as economically disadvantaged. Thus, the government contends that the 8(a) statute is not itself race-conscious; only the implementing SBA regulations are. And if the regulation were invalidated, the statute would remain; therefore, Dynalantic would be unable to compete for 8(a) contracts.

We think the government's statutory analysis is rather dubious. As appellant points out, the statute treats the concept of economic disadvantage as a subset of social disadvantage, not vice versa. The economically disadvantaged are defined as those "socially disadvantaged individuals whose ability to compete in the free enterprise system has

been impaired ... as compared to others ... who are not socially disadvantaged." 15 U.S.C. § 637(a)(6)(A). And the Act includes as a congressional *finding* that certain racial groups—the same groups as are identified in 13 C.F.R. § 124.105(b)(1)—are socially disadvantaged. *See* 15 U.S.C. §§ 631(f)(1)(B), (C). *See also* Amendments to Small Business Act, Pub.L. No. 95–507 §§ 201, 202, 92 Stat. 1757, 1760–61 (1978). In this respect, the 8(a) provisions are much like the program in *Bakke*: "a minority enrollment program with a secondary disadvantage element." 438 U.S. at 281 n. 14, 98 S.Ct. at 2743 n. 14 (Opinion of Powell, J.). Other sections of the Act are likewise race-conscious. *See, e.g.,* 15 U.S.C. § 637(d)(3)(C) ("[c]ontractor shall presume that socially and economically disadvantaged individuals include Black Americans, Hispanic Americans, Native Americans, Asian Pacific Americans, and other minorities"). Given these explicit statutory references to race, we do not think we can assume, certainly at this stage of the litigation, that the statute itself is invulnerable. Nor can we assume that Congress would have enacted 8(a) without its race-conscious theme or that it would, if the statute were held unconstitutional, commit itself to a program of the same scale directed only to the economically disadvantaged without regard to race.

In any event, if a favorable decision would lead only to the invalidation of the regulations, as we have explained, Dynalantic's injury would still be considerably mitigated. Were the regulatory presumption declared unconstitutional, only about 24 firms would still be 8(a) participants, thereby reducing almost to zero the possibility that any particular contract—including any flight simulator contract—would be awarded under the 8(a) program. The SBA might theoretically be free (assuming a cooperative Congress) to develop new, non-race-conscious regulatory requirements that Dynalantic could not meet,[3] but this future *possibility* is quite

---

2. Even if the statute created a 5% *requirement,* the SBA then would be obliged to alter the criteria to meet the requirement, and it is impossible to predict whether appellant would want to or could qualify under the new criteria.

3. The statute itself actually might *require* race-conscious regulations. *See* 15 U.S.C. §§ 631(f)(1)(B), (C) (congressional finding that certain racial groups are socially disadvantaged).

speculative. It is clear that if the regulations were invalidated, Dynalantic would be able to compete immediately on equal footing for virtually all simulator contracts.

■ The government has not questioned the imminence of any injury to Dynalantic— whether future use of the 8(a) program will impact on appellant—but it is an issue we should consider. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992). Dynalantic has performed simulator contracts in the past; actually 90% of its total revenue since 1984 stems from such contracts with the Defense Department. It contends that it is ready, willing, and able to bid for future Defense Department contracts. Still, a history of past bidding and a current willingness to bid do not demonstrate necessarily that "sometime in the relatively near future," *Adarand*, 515 U.S. at 211–13, 115 S.Ct. at 2105, the government will set aside under the 8(a) program a contract for which Dynalantic would otherwise attempt to bid. After all, the government could decide never again to set aside a simulator contract under 8(a).

Taking Dynalantic's allegations at this stage in the litigation as true, however, *see Lujan*, 504 U.S. at 561, 112 S.Ct. at 2136–37, and absent a government determination that no future simulator contracts will be awarded under 8(a), we think Dynalantic's injury looms close enough to support its standing to pursue the case. According to Dynalantic, the number of qualified 8(a) companies registered at the Naval Air Warfare Center, Training Systems Division, which is responsible for buying most of the Navy's training equipment and services, went from 51 to over 120 between 1993 and 1995, thereby increasing the likelihood that particular contracts will be awarded under the 8(a) program. Dynalantic also claims that the Center has a policy of setting aside every contract under the 8(a) program where qualified 8(a) firms are available, that "no discretion may be exercised" in deciding whether to set aside a contract, and that the award of contracts under the 8(a) program is used as a method for awarding certain contracts quickly. We are told that many sole source procurements are set aside under the 8(a) program without

any public notice, and thus Dynalantic learns about their award only after the fact. Dynalantic has not pointed to any particular procurement other than the APT, but this is understandable since when Dynalantic initially filed its various pleadings they were directed at the APT contract. We think appellant has demonstrated the likelihood that the government will, sometime in the near future, attempt to procure under the 8(a) program another contract for which Dynalantic is ready, willing, and able to bid.

\* \* \*

In sum, the interdependency of various provisions of the Act and the 8(a) regulatory scheme demonstrates that Dynalantic's injury—its inability to compete on equal footing with 8(a) participants—is traceable to the 8(a) program and is likely to be redressed by a decision holding all or part of the program unconstitutional. Dynalantic thus has standing to challenge the constitutionality of the 8(a) program, and the judgment of the district court is reversed.

HARRY T. EDWARDS, Chief Judge, dissenting:

Under the so-called "8(a)" program, agencies like the Department of Defense have been authorized by Congress to set aside certain government-contract work for *socially and economically disadvantaged* businesses that are otherwise qualified to perform the work. The statutory set-aside is not limited in terms of race, so it does not prescribe a benefit that is available only to members of racial minorities. Not surprisingly, appellant does not appear to doubt that Congress can, consistent with the Constitution, set aside certain contracts for socially and economically disadvantaged vendors. Rather, appellant asserts that the statute is constitutionally infirm because the *regulations* implementing the statute create a rebuttable presumption in favor of certain racial minorities. Appellant's claim rests on absurd reasoning, which proves only one thing: appellant has no standing to challenge the *statutory* scheme supporting the 8(a) program.

Appellant's challenge to the particular application of the 8(a) program in connection with the disputed APT procurement is moot,

because the government canceled its bid solicitation and gave adequate assurances that 8(a) would not be used again should solicitation be reopened. Thus, appellant has prevailed on the precise issue that prompted this law suit. However, applicant now smells blood and has decided that, so long as it is already in court, it might just as well use the occasion to attack the entire statute. Even assuming that appellant's complaint can be read to subsume a statutory challenge (which I doubt) and even conceding that appellant can amend its complaint to include this claim, it remains clear that appellant has *no standing* to raise a facial challenge to the statute.

Appellant has not demonstrated that it is socially and economically disadvantaged as required by the statute. Appellant, thus, cannot show the requisite causation and redressability to satisfy the Article III standing requirements to bring this challenge based on the alleged race-based presumption in the regulations. Even if the court strikes down the allegedly unconstitutional race-based "presumption" in the regulations that implement the 8(a) program, appellant cannot show how its position would be improved.

In order to participate in the 8(a) program, a vendor must be socially and economically disadvantaged, and these *statutory* criteria would remain in effect even if the regulatory presumption is deemed unlawful. Appellant concedes that it is not socially and economically disadvantaged. It follows, therefore, that appellant has no standing to challenge the statute, which on its face is lawful and under which appellant can claim no benefits.

## I. ANALYSIS

It is well established that, in order ·to satisfy the standing requirements of Article III, a plaintiff must demonstrate (1) that it has suffered injury that is concrete and particularized; (2) that the injury is fairly traceable to the conduct of which it complains; and (3) that the injury is likely to be redressed by a court decision in its favor. *See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 2136–37, 119 L.Ed.2d 351 (1992).

Appellant's alleged injury here is the inability to compete for 8(a) contracts. Appellant claims that the regulatory presumption that racial minorities are socially disadvantaged causes it injury, because the presumption effectively precludes it from competing with minority-owned businesses for government contracts under the 8(a) program. However, it is conceded that appellant would remain ineligible to bid on 8(a) contracts even if the regulatory presumption were removed, so it is clear that neither the causation nor redressability requirements of standing are satisfied.

### A. *The Statutory Structure of the 8(a) Program*

The legislation that creates the 8(a) set-aside does not define social and economic disadvantage in terms of race. *Socially disadvantaged* individuals are defined as "those who have been subjected to racial or ethnic prejudice or cultural bias because of their identity as a member of a group without regard to their individual qualities." 15 U.S.C. § 637(a)(5) (1994). *Economically disadvantaged* individuals are defined as "those socially disadvantaged individuals whose ability to compete in the free enterprise system has been impaired due to diminished capital and credit opportunities as compared to others in the same business area who are not socially disadvantaged. In determining the degree of diminished credit and capital opportunities the Administration shall consider, but not be limited to, the assets and net worth of such socially disadvantaged individual." 15 U.S.C. § 637(a)(6)(A) (1994). Thus, the statute at issue creates no race-based barrier to appellant's participation in the 8(a) program, because *all* socially and economically disadvantaged individuals, defined without regard to race, are eligible for the program.. Furthermore, consideration of social and economic disadvantage is not impermissible on its face, even if a disproportionate number of the parties who benefit from the standard are racial minorities. That minorities are disproportionately favored by such a program merely shows that minorities are disproportionately burdened by social and economic disadvantages. If Congress may consider "social and economic disadvantage" in the awarding of contracts, it surely may

adopt a set-aside to give relief to those who qualify on these terms.

During oral argument in this case, the suggestion was made that use of a "social and economic disadvantage" standard is essentially the same as providing that "only rich *white* business people will get procurement jobs." This suggestion is completely off the mark: the disputed "social and economic disadvantage" standard includes both whites and blacks, whereas the hypothetical standard favoring "rich white business people" expressly excludes blacks. No doubt a program preferring "rich white business people" would fail constitutional scrutiny, but to acknowledge this is to say absolutely nothing about the merits of the 8(a) set-aside.

B. *The Regulatory Structure of the 8(a) Program*

The regulations that implement Congress's statutory directive create a rebuttable presumption that certain racial minorities are socially disadvantaged. *See* 13 C.F.R. § 124.105(b)(1) (1996). Appellant claims that application of the presumption results in impermissible race bias and makes it clear that Dynalantic has standing to sue. Appellant is wrong on both counts.

First, the disputed presumption is "rebuttable," thus not every minority is entitled to 8(a) status. Furthermore, even if minorities gain an advantage from the presumption, they (like *all* prospective 8(a) applicants) must show "economic" disadvantage. *See* 13 C.F.R. § 124.106 (1996). No applicant gains access to the 8(a) program merely because of minority status, for all must pass the test of "economic disadvantage."

Second, even assuming, *arguendo,* that the presumption gives an impermissible advantage to minority applicants (and thus must be struck down), this would still afford no relief for appellant. The regulatory presumption is not a statutory mandate, so the 8(a) program would still survive without the presumption. The *statutory* directive focuses on "social and economic disadvantage," *not* race, and these criteria are concededly lawful. Because appellant is not (and does not seek to be) socially or economically disadvantaged, no redress would come by virtue of the regulatory presumption being struck down. Appel-

lant still would be ineligible to compete for 8(a) work.

At oral argument, the suggestion was made that, absent the presumption, procurement work formerly assigned to the 8(a) category would be made available to non-8(a) applicants like appellants. But there is absolutely nothing in the record to support this suggestion. Absent the presumption, the pool of work available for 8(a) set-asides will remain the same; and this work will be open for bids and awarded to applicants who satisfy the statutory "social and economic disadvantage" criteria. Appellant does not claim to satisfy these criteria, so it will gain nothing if the presumption is declared unlawful. Appellant, thus, fails to meet the causation and redressability requirements of standing, for it has not shown that any injury that it allegedly suffers from the 8(a) program results from the race-based presumption nor that removal of the race-based presumption would remedy its injury.

## II. CONCLUSION

Appellant's challenge to the particular APT procurement that gave rise to this case should be dismissed as moot. Appellant's belated facial challenge to the statutory 8(a) program should be dismissed for lack of standing.