**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUL 7 1998**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

CACHE VALLEY ELECTRIC
COMPANY, a Utah corporation,

      Plaintiff - Appellant,

v.

STATE OF UTAH DEPARTMENT OF
TRANSPORTATION and CHARLES K.
"CHUCK" LARSON, its civil rights
manager,

      Defendants - Appellees,

UNITED STATES DEPARTMENT OF
TRANSPORTATION,

      Defendant - Intervenor - Appellee.

No. 97-4042

---

**Appeal from the United States District Court**
**for the District of Utah**
**(D.C. No. 96-CV-62-W)**

---

George A. Hunt (Carolyn Stevens Jensen appearing with him on the briefs),
Williams & Hunt, Salt Lake City, Utah, for Plaintiff - Appellant.

Rebecca K. Troth (Isabelle Katz Pinzler, Acting Assistant Attorney General, Mark
L. Gross, Lisa J. Stark, Attorneys, on the brief), Washington, D.C., for
Defendants.

---

Before **BRISCOE**, Circuit Judge, **McWILLIAMS**, Senior Circuit Judge, and **LUCERO**, Circuit Judge.

---

**LUCERO**, Circuit Judge.

---

Cache Valley Electric Company ("CVE"), a Utah corporation that regularly bids on electrical contracts let by the Utah Department of Transportation ("UDOT"), sued the United States Department of Transportation ("DOT"), UDOT, and Charles K. Larson, UDOT's civil rights manager,[1] seeking to enjoin further operation of the Disadvantaged Business Enterprise ("DBE") program because of its use of racial and gender preferences. We affirm the district court's determination that CVE lacks standing to bring the present action.

## I

Through the DBE program, it has been the longstanding policy of the United States Department of Transportation to expend "not less than 10 percent of the amounts authorized to be appropriated" for certain federal highway programs "with small business concerns owned and controlled by socially and economically disadvantaged individuals." Intermodal Surface Transportation Efficiency Act of 1991, Pub. L. No. 102-240, § 1003(b)(1), 105 Stat. 1914, 1919 (1991) ("ISTEA"); Surface Transportation and Uniform Relocation Assistance Act of 1987, Pub. L.

---

[1] Larson was sued in his official capacity only. See Appellant's App. at 2.

No. 100-17, § 106(c)(1), 101 Stat. 132, 145 (1987) ("STURAA"). As a recipient of funds from the United States Department of Transportation for use in DOT-assisted contracts, UDOT is required to maintain an approved DBE program. See 49 C.F.R. § 23.41(a)(3). In this regard, UDOT establishes an annual overall DBE participation goal for UDOT projects financed with federal funds, and, to achieve that goal, identifies which projects have subcontracting opportunities for DBEs and determines the appropriate DBE participation goal for each. See Appellant's App. at 284.

To qualify to participate in the DBE program, a business must be both "small," see ISTEA § 1003(b)(2)(A) (stating that no entity may qualify as DBE if its "average annual gross receipts over the preceding 3 fiscal years" exceeds $15,370,000); 59 Fed. Reg. 67,367, 67,367 (1994) (increasing the revenue limit to $16,600,000 to adjust for inflation), and "owned and controlled by socially and economically disadvantaged individuals," id. § 1003(b)(1). Both the ISTEA and its predecessor statute, the STURAA, define "socially and economically disadvantaged" in accordance with section 8(d) of the Small Business Act ("SBA"), see 15 U.S.C. § 637(d), and its implementing regulations. See ISTEA § 1003(b)(2)(B); STURAA § 106(c)(2)(B). Under the SBA, "[s]ocially disadvantaged individuals are those who have been subjected to racial or ethnic prejudice or cultural bias because of their identity as a member of a group without

- 3 -

regard to their individual qualities." 15 U.S.C. § 637(a)(5). Economically disadvantaged individuals are defined as "socially disadvantaged individuals whose ability to compete in the free enterprise system has been impaired due to diminished capital and credit opportunities as compared to others in the same business area who are not socially disadvantaged." Id. § 637(a)(6)(A).

The statute also establishes a presumption that "Black Americans, Hispanic Americans, Native Americans, Asian Pacific Americans, and other minorities" are socially and economically disadvantaged. 15 U.S.C. § 637(d)(3)(C); see ISTEA § 1003(b)(2)(B); STURAA § 106(c)(2)(B). Both the ISTEA and the STURAA add women to that presumptive group. See ISTEA § 1003(b)(2)(B); STURAA § 106(c)(2)(B). Although the presumption is rebuttable, the burden is on the challenging party. See 49 C.F.R. §§ 23.62, 23.69; id. pt. 23, subpt. D, app. C. Those not entitled to a presumption of social and economic disadvantage may nonetheless attain DBE status by satisfying the race- and gender-neutral criteria established in the regulations. See 13 C.F.R. §§ 124.105(c)(1), 124.106; 49 C.F.R. pt. 23, subpt. D, apps. A & C.

Under UDOT's implementation of the ISTEA and relevant implementing regulations, a bid on federal highway projects is deemed responsive only if the requisite percentage of DBE participation is attained or, if that is not possible, by the bidder certifying that good faith efforts were used in an attempt to attain the

stated goal. See Appellant's App. at 39-40. Under UDOT's scheme, "DBE status must be granted to any DBE contractor by UDOT prior to bid opening." Id. at 42.

In the winter of 1995, UDOT solicited bids on two separate projects that would be at least partially funded by the federal government. CVE's owners are not members of groups presumed to be disadvantaged and the company cannot qualify as a DBE because its gross revenues exceed the statutory limit to qualify as a "small" business. CVE submitted the lowest bid to the prime contractor for the electrical work to be done on each of those two projects. In both cases, however, the prime contractor that ultimately won the contract selected the next lowest bid in an attempt to satisfy the DBE percentage goal. Both prime contractors attested that but for the DBE program they would have used CVE to perform the needed electrical work. CVE filed this action shortly thereafter. The company seeks a declaration that the DBE program is unconstitutional and an injunction prohibiting UDOT from presuming certain minority groups to be socially and economically disadvantaged.

## II

The district court ruled that CVE did not have standing to pursue the current action. We review this determination de novo. See Wilson v. Glenwood Intermountain Properties, Inc., 98 F.3d 590, 593 (10th Cir. 1996). In order to have standing, CVE must demonstrate: (1) an "injury in fact," meaning the

"invasion of a legally protected interest that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical; (2) a causal relationship between the injury and the challenged conduct," meaning that the "injury fairly can be traced to the challenged action of the defendant, and has not resulted from the independent action of some third party not before the court; and (3) a likelihood that the injury will be redressed by a favorable decision," meaning that "the prospect of obtaining relief from the injury as a result of a favorable ruling is not too speculative." Northeastern Fla. Chapter of the Associated Gen. Contractors of Am. v. City of Jacksonville, 508 U.S. 656, 663-64 (1993) (internal quotations and citations omitted).

In this type of equal protection case, "injury in fact" is defined as "the inability to compete on an equal footing in the bidding process." Id. at 666. "When the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group," a plaintiff establishes injury by showing "the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit." Id. In addition, to prove its injury is "imminent" such that it may seek forward-looking relief, CVE must make "an adequate showing that sometime in the relatively near future it will bid on another government contract that offers financial incentives to a prime contractor for hiring disadvantaged

subcontractors." Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 211 (1995).

Under this framework, we agree with the district court that plaintiff has

demonstrated an injury in "its inability to compete for government subsidized

contracts on an equal footing with businesses classified as DBEs pursuant to the

Section 8(a) program."[2] Moreover, pointing to the two contracts that it lost as a

result of the DBE program and relying on its representation that it will continue to

apply for UDOT electrical subcontracts in the relatively near future, CVE has also

established that its injury is "imminent."

Having defined its injury as the inability to compete on equal footing,

plaintiff must also demonstrate that such injury is "fairly traceable" to the

disputed conduct of defendants—namely, the use of allegedly unconstitutional

---

[2] Defendants argue that CVE never challenged the entire program, but only challenged "the manner by which UDOT identifies DBEs." Thus, defendants argue, CVE lacks standing because its annual average gross receipts—$40 million—are well above the statutory threshold for admission into the program. See ISTEA § 1003(b)(2)(A); 59 Fed. Reg. at 67,367; Wilson, 98 F.3d at 593 ("[A] person who fails to satisfy lawful, nondiscriminatory requirements or qualifications for the benefit lacks standing to raise claims of discrimination in the denial of the benefit."). Although we agree with defendants that CVE would lack standing if all it sought to do was challenge the admission criteria for the DBE program, we cannot construe plaintiff's challenge in so limited a fashion. Its prayer for relief states that the "DBE program on its face and as applied violates the Fifth and Fourteenth Amendments . . . because it utilizes inherently suspect gender and/or racial-based classifications . . . ." Appellant's App. at 5. Moreover, plaintiff strenuously argued both before the district court and on appeal that its injury is attributable to the DBE program and not to its inability to participate in that program. See Appellant's App. at 814; Appellant's Br. at 25. Thus, plaintiff's position is clearly a challenge to the entire program based on its usage of allegedly improper race and gender preferences. To hold otherwise would favor semantics over substance.

race and gender preferences—and that the relief sought—namely, the elimination of the disputed preferences—will provide redress for the injury claimed.  See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992).  "Traditionally, redressability and traceability overlap as two sides of a causation coin." Dynalantic Corp. v. Department of Defense, 115 F.3d 1012, 1017 (D.C. Cir. 1997).  Though CVE points to Adarand as dispositive on both causation and redressability, we do not find Adarand controlling.  In Adarand, the standing analysis was limited to a detailed discussion of how to demonstrate an injury of sufficient imminence to satisfy standing requirements for forward-looking relief. See id. at 210-12.  Although Adarand's definition of injury necessarily impacts whether a plaintiff will be able to demonstrate traceability and redressability, Adarand offers no analysis on these points, instead merely stating "that Adarand has standing to bring this lawsuit."  See id. at 212.  Thus, although the plaintiff in Adarand made a challenge similar to CVE's, the Adarand Court is silent on what impact the severability of the disputed preferences and the existence of race- and gender-neutral criteria have on the analysis of traceability and redressability.[3]

_____

[3] This is unlike the situation in City of Jacksonville in which 10% of the funds spent on the city's contracts were required to go to minority- and women-owned businesses.  See 508 U.S. at 658.  When, as there, the set-aside is conditioned solely on race or gender, the definition of the injury as the inability to compete on equal footing makes it explicitly traceable to the disputed preference and the elimination of that preference therefore must redress the injury.  See id. at 666 n.5.

Here, assuming for the sake of argument that plaintiff has established that its injury is "fairly traceable" to the DBE program and its race and gender preferences, it would be pure speculation to conclude that invalidating the allegedly unconstitutional preferences would ameliorate plaintiff's ability to compete in any way. This is true for two reasons. First, the disputed preferences are severable from the rest of the DBE program and thus the program would remain viable even absent those preferences. Second, the plaintiff has adduced no evidence that the elimination of the preferences would result in any meaningful reduction in the number of qualifying DBEs. We therefore must conclude that plaintiff lacks standing because any anticipated redress from a favorable decision is wholly speculative.

## A. Severability

Plaintiff argues that its injury is redressable because eliminating the allegedly unconstitutional presumption will eviscerate the statute. We disagree. "The standard for determining the severability of an [allegedly] unconstitutional provision is well established: 'Unless it is evident that the Legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as a law.'" Alaska Airlines, Inc. v. Brock, 480 U.S. 678, 684 (1987) (quoting Buckley v. Valeo, 424 U.S. 1, 108 (1976) (per curiam)). Here, the basic intent of the

- 9 -

operative statute is to foster growth in small businesses owned by "socially and economically disadvantaged" people. The ISTEA allows a small business entity to qualify as "socially and economically disadvantaged" in either of two ways: first, by relying on the race- or gender-based presumption of such disadvantage, see ISTEA § 1003(b)(2)(B); or, second, by satisfying the race- and gender-neutral criteria established in the statute and amplified in the regulations, see 15 U.S.C. §§ 637(a)(5), 637(a)(6)(A); 13 C.F.R. §§ 124.105(c), 124.106; 49 C.F.R. pt. 23, subpt. D, app. C. Consequently, there is no truth to CVE's claim that socially disadvantaged individuals—and, by extension, economically disadvantaged individuals—are necessarily minorities. See Appellant's Reply Br. at 16.

Based on this statutory framework, it is clear that the legislative intent to foster development in small businesses whose owners have had to overcome social and economic hardship would remain even in the absence of the challenged presumption. To conclude otherwise would erroneously ignore the statutory race- and gender-neutral methods of establishing social and economic disadvantage. See American Stores Co. v. American Stores Co. Retirement Plan, 928 F.2d 986, 990 (10th Cir. 1991) ("Courts should attempt to give some reasonable meaning to all of the words included in a legislative enactment."); Bridger Coal Co./Pac. Minerals, Inc. v. Director, OWCP, United States Dep't of Labor, 927 F.2d 1150,

1153 (10th Cir. 1991) ("We will not construe a statute in a way that renders words or phrases meaningless, redundant, or superfluous.").

The legislative history to the SBA and the ISTEA further indicates that the presumption is severable from the rest of the DBE program. The House Conference Report accompanying the passage of the ISTEA discusses the potential benefits of the DBE program, including "additional tax revenues paid to the state by DBE firms; unemployment tax reduction; racial and gender diversity in the highway construction field; economic developing in disadvantaged communities as a result of increased capital to DBEs; and an increase in the number of skilled subcontractors in the highway construction field, thus providing for greater competition among such contractors in the future." See H.R. Conf. Rep. No. 102-404, at 306 (1991), reprinted in 1991 U.S.C.C.A.N. 1679, 1686. Although the allegedly impermissible goal of racial and gender diversity is included in this list, all of the other stated benefits are completely unrelated to racial or gender preference. In addition, the legislative history of amendments to the SBA effectively indicates that the primary goal of the ISTEA's DBE program is to aid socially and economically disadvantaged businesses. The added presumption serves only as recognition that "in many . . . cases status as a minority can be directly and unequivocally correlated with social disadvantagement and this condition exists regardless of the individual, personal

- 11 -

qualities of that minority person." See H.R. Conf. Rep. No. 95-1714, at 21 (1978), reprinted in 1978 U.S.C.C.A.N. 3879, 3882; see also id. at 22 ("[T]he Conferees realize that other Americans may also suffer from social disadvantagement because of cultural bias. For example, a poor Appalachian white person who has never had the opportunity for a quality education or the ability to expand his or her cultural horizons, may similarly be found socially disadvantaged, provided that the conditions leading to such disadvantagement are beyond the ability of the person to control."), reprinted in 1978 U.S.C.C.A.N. 3879, 3882. The legislative history, therefore, confirms that Congress would have enacted this legislation regardless of the allegedly impermissible goal of favoring minority- and women-owned businesses.

## B. Meaningful Reduction in Number of DBEs

The DBE program would continue even absent the disputed presumption, so that small businesses whose owners could prove they were disadvantaged—and thereby qualify as DBEs—would continue to have an advantage over businesses like CVE that are too large to qualify as DBEs. However, we recognize that CVE might nonetheless establish standing by demonstrating that a favorable judicial determination would "likely" improve the terms of competition it faces. See Defenders of Wildlife, 504 U.S. at 561. To do this, however, CVE would have to show at a bare minimum that the practical effect of eliminating the presumption

would be some meaningful reduction in the number of DBEs against which it would be forced to compete. The reduction would have to be meaningful else a claimed reduction in the number of contracts awarded to DBEs would be no more than speculation and accordingly insufficient to establish standing. Because, at summary judgment, it is a plaintiff's burden to adduce evidence sufficient to establish necessary jurisdictional facts, see id., CVE may not establish standing by merely hypothesizing that elimination of the presumption would improve its terms of competition. Yet that is all it has done in this case. In fact, the record before us includes no evidence that any DBEs would be disqualified as a result of eliminating the presumption.

In its complaint, CVE points to two separate contracts it lost to High Desert Contractors, Inc. ("High Desert") solely because High Desert is a DBE. See Appellant's App. at 4. According to UDOT, "High Desert is certified as a DBE because of its president's . . . Hispanic national origin and because [the president] demonstrated to the satisfaction of the SBA that she was socially and economically disadvantaged." Appellant's App. at 287 (declaration of Charles K. Larson, Civil Rights Manager for UDOT) (emphasis added). But CVE has adduced no evidence that the SBA's determination of social and economic disadvantage was based on consideration of the allegedly impermissible presumption. Indeed, the president of High Desert indicated that the SBA's

certification "was on the basis of my national origin . . . and because I demonstrated to the satisfaction of the SBA that I was socially and economically disadvantaged," see id. at 311 (declaration of Victoria Gilbert, president of High Desert) (emphasis added), and CVE has offered nothing to refute her claim. Accordingly, any suggestion that High Desert would not continue to qualify as a DBE even if deprived of the disputed presumption is pure speculation.

With respect to other subcontractors, the record does contain a list of businesses that UDOT has certified as DBEs. The record, however, is silent on whether those subcontractors relied on the disputed presumption, the race- and gender-neutral criteria, or both to receive such certification. In fact, there is no evidence that any other subcontractors against whom CVE competes would lose their DBE status as a result of eliminating the presumption. CVE has therefore made no showing that an improvement in its terms of competition for subsequent contracts would likely result from a substantive adjudication in its favor. Standing is denied.

**AFFIRMED.**

Judge McWilliams dissents.