# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

―――

Argued March 10, 2016          Decided September 9, 2016

No. 15-5176

ROTHE DEVELOPMENT, INC.,
APPELLANT

v.

UNITED STATES DEPARTMENT OF DEFENSE AND UNITED
STATES SMALL BUSINESS ADMINISTRATION,
APPELLEES

―――

Appeal from the United States District Court
for the District of Columbia
(No. 1:12-cv-00744)

―――

*David F. Barton* argued the cause and filed the briefs for
appellant.

*Meriem L. Hubbard*, *Ralph W. Kasarda*, and *Joshua P.
Thompson* were on the brief for *amici curiae* Pacific Legal
Foundation and Center for Equal Opportunity in support of
appellant.

*Steven J. Lechner* was on the brief for *amicus curiae*
Mountain States Legal Foundation in support of appellant.

*Michael E. Rosman* was on the brief for *amicus curiae*
Center for Individual Rights in support of appellant.

*Teresa Kwong*, Attorney, U.S. Department of Justice, argued the cause for appellees.  With her on the brief was *Mark L. Gross*, Attorney.  *R. Craig Lawrence*, Assistant U.S. Attorney, entered an appearance.

*Sherrilyn Ifill*, *Janai Nelson*, *Christina Swarns*, and *Daniel W. Wolff* were on the brief for *amici curiae* NAACP Legal Defense and Educational Fund, Inc., Asian Americans Advancing Justice, AAJC, and the Leadership Conference of Civil and Human Rights in support of appellees.

*Christine V. Williams* was on the brief for *amici curiae* Native American Contractors Association, et al. in support of appellees.

Before: HENDERSON, GRIFFITH and PILLARD, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* PILLARD.

Opinion concurring in part and dissenting in part filed by *Circuit Judge* HENDERSON.

PILLARD, *Circuit Judge*:  Plaintiff-Appellant Rothe Development, Inc. (Rothe) alleges that the statutory basis of the Small Business Administration's 8(a) business development program, Amendments to the Small Business Act, Pub. L. No. 95-507, ch. 1, sec. 202(a), 92 Stat. 1757, 1761 (1978) (codified at 15 U.S.C. § 637), violates its right to equal protection under the Due Process Clause of the Fifth Amendment.  Congress created the 8(a) program to extend government contracting opportunities to small business owners whose access to such opportunities was impaired by those individuals' experience of racial or ethnic prejudice or

cultural bias. Rothe contends that the statute contains a racial classification that presumes that certain racial minorities are eligible for the program. But, in fact, Congress considered and rejected statutory language that included a racial presumption. Congress chose instead to hinge participation in the program on the facially race-neutral criterion of social disadvantage, which it defined as having suffered racial, ethnic, or cultural bias.

The challenged statute authorizes the Small Business Administration (SBA) to enter into contracts with other federal agencies, which the SBA then subcontracts to eligible small businesses that compete for the subcontracts in a sheltered market. 15 U.S.C. § 637(a)(1)(A)-(D). Businesses owned by "socially and economically disadvantaged" individuals are eligible to participate in the 8(a) program. *Id*. § 637(a)(1)(B).[1] The statute defines socially disadvantaged individuals as persons "who have been subjected to racial or ethnic prejudice or cultural bias because of their identity as a member of a group without regard to their individual qualities." *Id*. § 637(a)(5).

Rothe is a small business that bids on Defense Department contracts, including the types of subcontracts that the SBA awards to economically and socially disadvantaged businesses through the 8(a) program. Rothe does not purport to be owned by an individual who has experienced racial or ethnic prejudice or cultural bias, and alleges that it "cannot participate in and has no desire to participate in the section 8(a) program." 1 App. 74 (Compl. ¶ 33). It objects to the program because it believes that the statute contains an

---

[1] Businesses owned by economically disadvantaged Indian tribes or Native Hawaiian organizations also qualify for the 8(a) program, *see* 15 U.S.C. § 637(a)(4)(A), but Rothe does not challenge that aspect of the statute.

unconstitutional racial classification that prevents Rothe from competing for Department of Defense contracts on an equal footing with minority-owned businesses.

We disagree, because the provisions of the Small Business Act that Rothe challenges do not on their face classify individuals by race.[2] Section 8(a) uses facially race-neutral terms of eligibility to identify individual victims of discrimination, prejudice, or bias, without presuming that members of certain racial, ethnic, or cultural groups qualify as such. That makes it different from other statutes that either expressly limit participation in contracting programs to racial or ethnic minorities or specifically direct third parties to presume that members of certain racial or ethnic groups, or minorities generally, are eligible. Congress intentionally took a different tack with section 8(a), opting for inclusive terms of eligibility that focus on an individual's experience of bias and aim to promote equal opportunity for entrepreneurs of all racial backgrounds.

In contrast to the statute, the SBA's regulation implementing the 8(a) program does contain a racial classification in the form of a presumption that an individual who is a member of one of five designated racial groups (and within them, 37 subgroups) is socially disadvantaged. *See* 13 C.F.R. § 124.103(b). This case does not permit us to decide whether the race-based regulatory presumption is constitutionally sound, for Rothe has elected to challenge

---

[2] We refer to those statutory provisions collectively as "section 8(a)," after the section of the public law that originally authorized the SBA's contracting program, *see* Small Business Act of 1958, Pub. L. No. 85-536, § 8(a)(1)-(2), 72 Stat. 384, 389-91, but otherwise cite the codified versions of the relevant provisions. We refer to the contracting program as a whole, including the SBA's regulations, as the "8(a) program."

only the statute. Rothe alleged in its complaint that the "racial classification of section 8(a) of the Small Business Act, defined herein, is facially unconstitutional." *Compare* 1 App. 68 (Compl. ¶ 1) *and id*. at 76-77 (claims for relief), *with W. States Paving Co. v. Wash. State Dep't of Transp.*, 407 F.3d 983, 990-91 (9th Cir. 2005) (plaintiff challenged both a statute's race-neutral definition of social disadvantage and the agency's racial presumption). Rothe's definition of the racial classification it attacks does not include the SBA's regulation. *See infra* 7; 1 App. 71-72 (Compl.); Appellant Br. 2-3.

Rothe's counsel's statements during oral argument confirm the limited scope of Rothe's challenge. When we asked counsel whether Rothe was challenging a racial classification that appeared "[i]n the statute or in the regulations," he specified that Rothe was challenging the presumption "[i]n the statute." Oral Arg. Tr. 4. We followed up: "[I]s the constitutional flaw in the statute alone, or is it in the statute and the regulations together?" Counsel for Rothe reiterated: "It's in the statute alone . . . ." *Id*. at 5. It is thus clear that the regulations are beyond the scope of Rothe's challenge. If there were any doubt, we would be obliged to read the complaint narrowly to reach the same conclusion. *See Am. Fed'n of Gov't Emps., AFL-CIO v. United States*, 330 F.3d 513, 517-19 (D.C. Cir. 2003) (construing plaintiffs' suit in a manner that avoided raising an equal protection problem).

Because the statute lacks a racial classification, and because Rothe has not alleged that the statute is otherwise subject to strict scrutiny, we apply rational-basis review, which the statute readily survives. Rothe's evidentiary and nondelegation challenges to the decision below also fail. We therefore affirm the judgment of the district court granting summary judgment to the SBA and Department of Defense,

*see Rothe Dev., Inc. v. Dep't of Def.*, 107 F. Supp. 3d 183, 212-13 (D.D.C. 2015), albeit on different grounds.

## I.

The central question on appeal is whether section 8(a) of the Small Business Act warrants strict judicial scrutiny. The parties and the district court seem to think it does. *See* Appellant Br. 10; Appellee Br. 16; *Rothe*, 107 F. Supp. 3d at 189, 207; *but see* Oral Arg. Tr. 23 (Judge Griffith: "In your view does the statute create racial classifications, or is it the regulations?" Counsel for the government: "I believe it's the regulations . . . ."). That fact does not relieve us of our duty to assess independently the legal issue before us. *See United States v. Bigley*, 786 F.3d 11, 17 (D.C. Cir. 2015) (Brown, J., concurring in the judgment) ("But we are required to 'conduct an independent review' of a legal issue, despite the government's concession on appeal." (quoting *United States v. Russell*, 600 F.3d 631, 636 (D.C. Cir. 2010)); *cf. The Anaconda v. Am. Sugar Refining Co.*, 322 U.S. 42, 46 (1944) (A party "cannot stipulate away" what "the legislation declares").

There are at least three ways a plaintiff can plead an equal protection violation. A plaintiff may allege that the government has expressly classified individuals based on their race, *see Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 712, 716, 720 (2007); that the government has applied facially neutral laws or policies in an intentionally discriminatory manner, *see Yick Wo v. Hopkins*, 118 U.S. 356, 373-74 (1886); or that facially neutral laws or policies "result in racially disproportionate impact and are motivated by a racially discriminatory purpose," *Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 213 (1995) (citing *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252

(1977), and *Washington v. Davis*, 426 U.S. 229 (1976)). Rothe advances only the first theory—that, on its face, section 8(a) of the Small Business Act contains a racial classification. *See* 1 App. 68 (Compl. ¶ 1) (seeking "to obtain a declaration that the racial classification of section 8(a) of the Small Business Act, defined herein, is facially unconstitutional"). "[A]ll racial classifications imposed by government 'must be analyzed by a reviewing court under strict scrutiny.'" *Grutter v. Bollinger*, 539 U.S. 306, 326 (2003) (quoting *Adarand*, 515 U.S. at 227); *see Fisher v. Univ. of Tex. at Austin*, 133 S. Ct. 2411, 2419 (2013) ("[U]nder *Grutter*, strict scrutiny must be applied to any admissions program using racial categories or classifications.").

According to Rothe, three provisions instantiate the statute's racial classification:  (1) the statutory definition of socially disadvantaged individuals; (2) a government-wide goal of letting 5% of federal contracts to small businesses owned by socially disadvantaged individuals; and (3) the findings section of the statute, which Rothe contends includes a presumption that members of the specified racial groups are socially disadvantaged.  In our view, none of the three components—separately or together—imposes an express racial classification subject to strict scrutiny.

### A.

Rothe first alleges that 15 U.S.C. § 637(a)(5)'s "definition of the term 'socially disadvantaged' contains a racial classification." 1 App. 71 (Compl. ¶ 21).  We disagree. The statute defines socially disadvantaged individuals as "those who have been subjected to racial or ethnic prejudice or cultural bias because of their identity as a member of a group without regard to their individual qualities." 15 U.S.C. § 637(a)(5).  That definition does not "distribute[] burdens or

benefits on the basis of individual racial classifications." *Parents Involved*, 551 U.S. at 720. "[T]he term 'socially . . . disadvantaged' is race-[]neutral on its face . . . ." *W. States Paving Co.*, 407 F.3d at 988 (O'Scannlain, J.). It speaks of individual victims of discrimination. On its face, section 637(a)(5) envisions an individual-based approach that focuses on experience rather than on a group characteristic. Many individuals—of all races—have experienced discrimination on account of their race or ethnicity, and victims of discrimination do not comprise a racial or ethnic group; a person of any racial or ethnic background may suffer such discrimination. And the statute recognizes that not all members of a minority group have necessarily been subjected to racial or ethnic prejudice or cultural bias.

The focus on individuals who have experienced discrimination distinguishes section 637(a)(5) from the racial classification the Supreme Court considered in *Regents of the University of California v. Bakke*, 438 U.S. 265 (1978). There, the university's medical school reserved 16 of 100 spaces in its class for "disadvantaged" students. *Id*. at 272, 279 (opinion of Powell, J.). But under the *Bakke* program, an explicit factor in determining disadvantage was an applicant's race—not his or her individual experience of racial or ethnic discrimination. *Id*. at 274-75 & n.4. Thus, Justice Powell concluded, the program "was a minority enrollment program with a secondary disadvantage element" and therefore qualified as a racial classification. *Id*. By contrast, section 637(a)(5) does not provide for preferential treatment "based on [an applicant's] race—a *group* classification long recognized as 'in most circumstances irrelevant and therefore prohibited,'" *Adarand*, 515 U.S. at 227 (quoting *Hirabayashi v. United States*, 320 U.S. 81, 100 (1943)), but rather on an individual applicant's experience of discrimination. In other words, this is not a provision in which "the race, not the

person, dictates the category." *Palmore v. Sidoti*, 466 U.S. 429, 432 (1984) (describing racial classifications).

Unlike the program in *Bakke*, in which disadvantaged nonminority applicants could not participate, 438 U.S. at 281 n.14, section 637(a)(5)'s plain terms permit individuals of any race to be considered "socially disadvantaged." Contrary to our dissenting colleague's contention, Dissent at 3, 6-7, 10, 14-17, we do not believe such inclusiveness alone renders the statute race-neutral; it is necessary but not sufficient. Our key point is that the statute is easily read not to require any group-based racial or ethnic classification. The statute defines socially disadvantaged *individuals* as "those [individuals] who have been subjected to racial or ethnic prejudice or cultural bias," not, as the dissent suggests, those individuals *who are members of groups* that have been subjected to prejudice or bias. The statute references groups, but it does so not as "a floor for participation," Dissent at 6, but to identify an important kind of social disadvantage Congress had in mind: *individuals*' experience of having suffered "racial or ethnic prejudice or cultural bias because of their identity as a member of a group without regard to their individual qualities." 15 U.S.C. § 637(a)(5); *see id.* § 631(f)(1)(B), (C).

Of course, the SBA's implementation of section 637(a)(5)'s definition may well be based on a racial classification if the regulations carry it out in a manner that, like the program in *Bakke*, gives preference based on race instead of individual experience. But as we have explained, Rothe has expressly disclaimed any challenge to the SBA's implementation of section 637(a)(5) or to any other portions of the Small Business Act. As a result, the only question before us is whether the statute itself classifies based on race. Section 637(a)(5) makes no such classification.

B.

Rothe alleges that the second component of the putative "racial classification of section 8(a)" is the "statutory goal" found at 15 U.S.C. § 644(g)(1) "to award a certain percentage of prime- and sub-contracts to socially disadvantaged small business concerns." 1 App. 72-73 (Compl. ¶¶ 24-25). Section 644(g)(1) establishes several government-wide contracting targets, including an aspirational goal that at least five percent of the total value of the government's prime contract and subcontract awards for each fiscal year go to "small business concerns owned and controlled by socially and economically disadvantaged individuals." 15 U.S.C. § 644(g)(1)(A)(iv).

For starters, we take issue with Rothe's characterization of section 644(g)(1)'s goal as part of the 8(a) program. It is not. While contracts let through the 8(a) program may help the government as a whole to meet section 644(g)'s objectives, section 644(g)'s goal is not itself a part of the 8(a) program. *Id.* § 644(g)(1); *see DynaLantic Corp. v. U.S. Dep't of Def.*, 885 F. Supp. 2d 237, 244-45 (D.D.C. 2012). Indeed, government contracts awarded to businesses owned by disadvantaged individuals without the benefit of programs such as the 8(a) program—that is, contracts they win through "unrestricted competition"—count toward section 644(g)'s goal. *See* 15 U.S.C. § 644(g)(2)(E). At any rate, section 644(g)(1)'s goal is not a racial classification. Like section 8(a), it refers to "socially and economically disadvantaged individuals"; it does not define the relevant business owners by their race.

C.

Rothe points to a third component of the statute that it argues creates a "presumption that all individuals who are members of certain racial groups are socially disadvantaged." 1 App. 72 (Compl. ¶ 22). According to Rothe, the racial presumption can be found at 15 U.S.C. § 631(f)(1). *Id*.; *see also* Pl.'s Mem. in Supp. of Mot. Summ. J. at 8, *Rothe Dev., Inc. v. Dep't of Def.*, No. 12-cv-744 (D.D.C. May 15, 2014), ECF No. 56 ("The statute also contains an additional racial classification in a presumption that all individuals who are members of certain racial groups are socially disadvantaged. [15 U.S.C.] § 631(f)(1)."). But that provision creates no racial presumption or classification.

Section 631(f), which falls under the heading "Declaration of policy," is entitled "Findings; purpose." 15 U.S.C. § 631(f). The provision states Congress's conclusion that it is in the nation's interest "to expeditiously ameliorate the conditions of socially and economically disadvantaged groups," *id.* § 631(f)(1)(D), so that socially and economically disadvantaged persons may fully participate in the economy and "obtain social and economic equality," *id*. § 631(f)(1)(A). *See also id.* § 631(f)(2)(A) (declaring that one purpose of section 8(a) is to "promote the business development of small business concerns owned and controlled by socially and economically disadvantaged individuals so that such concerns can compete on an equal basis in the American economy"). It explains that "many [socially and economically disadvantaged] persons are socially disadvantaged because of their identification as members of certain groups that have suffered the effects of discriminatory practices or similar invidious circumstances over which they have no control." *Id*. § 631(f)(1)(B). It goes on to observe "that such groups include, *but are not limited to*, Black Americans, Hispanic

Americans, Native Americans, Indian tribes, Asian Pacific Americans, Native Hawaiian Organizations, and other minorities." *Id.* § 631(f)(1)(C) (emphasis added). According to Rothe, section 631(f)(1) creates a presumption that members of the listed groups, and racial minorities more generally, are socially disadvantaged and are thereby eligible to participate in the 8(a) program, absent a showing to the contrary.

We disagree. Section 631(f)(1) is located in the findings section of the statute, not in the operative provision that sets forth the program's terms and the criteria for participation. Section 637(a)(5) is where Congress defined the program's terms. The statutory findings, by contrast, are just that—findings about the social realities that Congress believed supported providing temporary business-development training and contracting opportunity to small disadvantaged firms. Preceded by the statement "Congress finds," *id.* § 631(f)(1), they reflect Congress's determination that many individual business owners were socially disadvantaged because people who would otherwise have done business with them assumed, based on their group-related identifiers (race, ethnicity or culture), that they had disqualifying shortcomings. Congress reasoned that business owners, underrated due to bias or prejudice, were likely to have been deprived of the opportunities and experiences that help small businesses to develop. Congress's findings that individual business owners may have been unfairly subjected to race-based disadvantage do not, however, impose or necessarily contemplate any race-based classification in the statutory response, nor do such findings supplant the race-neutral definition of social disadvantage found in section 637(a)(5).

As explained above, section 637(a)(5) does not classify on the basis of ethnicity or race. Findings, like a preamble,

may contribute to "a general understanding of a statute," but, unlike the provisions that confer and define agency powers, they "are not an operative part of the statute." *Ass'n of Am. R.Rs. v. Costle*, 562 F.2d 1310, 1316 (D.C. Cir. 1977). The EPA in *Costle* could not rely on the statutory preamble's mention of "major noise sources" to limit the agency to regulating only those sources that were major in the face of operative statutory language imposing an obligation to regulate noise more generally. *Id.* The congressional findings here referring to specified racial and ethnic "groups that have suffered the effects of discriminatory practices" are just as inoperative for the purpose Rothe ascribes to them as was the preamble in *Costle*.

There are many reasons Congress might have identified certain racial groups when announcing the policy behind the 8(a) program. Congress might have wanted to offer paradigmatic examples of the problem or to send a signal of responsiveness to Americans of minority backgrounds, many of whom felt they lacked a fair shot at the American dream. But our concern in this case is not why Congress identified minority groups in section 631(f)(1), but whether, in doing so, it set special terms of preference for individuals based on their membership in a racial or ethnic minority group. Congress did not. Put simply, the preambulatory language of section 631(f)(1), taken alone or together with section 637(a)(5), does not create a presumption that a member of a particular racial or ethnic group is necessarily socially disadvantaged, nor that a white person is not.

The SBA's first regulation implementing the statutory definition of social disadvantage lends support to that conclusion. *See* 13 C.F.R. Part 124.1-1(c)(3), 44 Fed. Reg. 30672, 30674 (1979). That regulation acknowledged the statute's reference to social disadvantage suffered by

members of statutorily identified groups, but eschewed presumptive eligibility based on group membership. The regulation required individualized social-disadvantage showings. It provided that "[t]he social disadvantage of individuals, including those within the above-named groups, shall be determined by the SBA on a case-by-case basis," and further specified that "[m]embership alone in any group is not conclusive that an individual is socially disadvantaged." *Id*. That regulation squarely contradicts the view that the statute forecloses the SBA from requiring "that every individual black American establish *individual* social disadvantage." Dissent at 8. It demonstrates that the statute need not be implemented through a presumption that members of the named racial groups are, by token of their group membership, socially disadvantaged.

## D.

The dissent points to a fourth component of the statute that it believes enacts a racial presumption subject to strict scrutiny—15 U.S.C. § 637(a)(8). Section 637(a)(8) states:

> All determinations made pursuant to [15 U.S.C. § 637(a)(5), which defines socially disadvantaged individuals,] with respect to whether a group has been subjected to prejudice or bias shall be made by the Administrator after consultation with the Associate Administrator for Minority Small Business and Capital Ownership Development.

According to the dissent, that provision makes membership in a particular racial or ethnic group a proxy for social disadvantage and directs the SBA to identify certain racial groups whose members will be presumed to be socially disadvantaged. Section 637(a)(8), the dissent contends, works together with section 637(a)(5)—the section defining

socially disadvantaged individuals—to operationalize Congress's findings in section 631(f)(1). Together, our colleague contends, those components make clear that Congress created a racial presumption. *See* Dissent at 4-6, 10-11.

For several reasons, however, we do not read section 637(a)(8)'s reference to groups, whether alone or together with the other parts of the statute, as creating a racial presumption triggering strict scrutiny.

Most importantly, the text of section 637(a)(8) does not create a racial presumption. It states that "[a]ll determinations made pursuant to [section 637(a)(5), which defines socially disadvantaged individuals,] with respect to whether a group has been subjected to prejudice or bias shall be made" by the SBA Administrator after consultation with the SBA official responsible for minority small business development. To be sure, that clause contemplates that the SBA will identify group-salient traits and accompanying forms of bias that it may consider when evaluating claims of social disadvantage. But we see nothing problematic about that. The definition of socially disadvantaged individuals makes reference to groups; it states that individuals who have been subject to bias because of their group-based characteristics may be eligible for the program. The dissent overlooks the second sentence of section 637(a)(8), which contemplates that "other" determinations, unrelated to group-based characteristics, may be made pursuant to section 637(a)(5), suggesting that the statute allows but does not require determinations about groups as part of section 637(a)(8)'s regulatory implementation.

As we have explained, section 637(a)(8)'s definition of social disadvantage does not amount to a racial classification,

for it ultimately turns on a business owner's experience of discrimination. Section 637(a)(8) shows that Congress was concerned with individuals' experiences of disadvantage due to certain forms of cultural, ethnic, and racial prejudice. But it does not instruct the agency to limit the field to certain racial groups, or to racial groups in general, nor does it tell the agency to presume that anyone who is a member of any particular group is, by that membership alone, socially disadvantaged.

As we read the statute, it neither contains any racial classification nor mandates the SBA to employ one. Even if the statute could be read to permit the agency to use a racial presumption, the canon of constitutional avoidance directs that we not construe the statute in a manner that renders it vulnerable to constitutional challenge on that ground. *See Pub. Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 466 (1989) ("[W]here an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress." (internal quotation marks omitted)).

The dissent believes there is only one way to understand the statute—that it imposes a racial classification—and thus does not address our responsibility to avoid constitutional problems where a reasonable statutory reading so permits. But to reach the dissent's view requires leaps. First, one would have to read section 637(a)(5), either on its own or in tandem with section 637(a)(8), not just to authorize but to require the agency to make group-based determinations of social disadvantage. *See* Dissent at 7-8. Second, one would have to believe that the language in the findings requires the agency to label all members of those particular groups disadvantaged by virtue of that membership alone. *See id.* at

6-7. We have identified reasons at each step to believe the opposite. And, "when deciding which of two plausible statutory constructions to adopt, a court must consider the necessary consequences of its choice. If one of them would raise a multitude of constitutional problems, the other should prevail . . . ." *Clark v. Martinez*, 543 U.S. 371, 380-81 (2005). We decline to read the statute to create a constitutional difficulty. *See INS v. St. Cyr*, 533 U.S. 289, 299-300 (2001).

Several contextual considerations confirm that our reading of the text is the better reading:

*First*, Congress affirmatively chose to jettison an express racial presumption that appeared in an earlier version of the bill. *See INS v. Cardoza-Fonesca*, 480 U.S. 421, 442-43 (1987) ("Few principles of statutory construction are more compelling than the proposition that Congress does not intend *sub silentio* to enact statutory language that it has earlier discarded in favor of other language." (citation omitted)). The House version offered two routes to eligibility in the 8(a) program. Individuals who were "Black Americans and Hispanic Americans" were presumed to be socially and economically disadvantaged. H.R. Rep. No. 95-949, at 16 (1978). All other individuals had to demonstrate that they faced barriers to business formation, development, and success on account of social and economic forces beyond their control. *Id.* The House Committee explained that its race-based presumption of eligibility "[was] based upon the congressional findings" in the first part of the bill. *Id.* In contrast, the Senate version of the bill had no presumption and did not refer to any particular racial groups when defining social and economic disadvantage. *See* S. Rep. No. 95-1070, at 13-16, 25. Critically, the Conference Committee dropped the House's presumption from the final version of the bill and

opted, with section 637(a)(5)'s definition of socially disadvantaged individuals, for language much closer to the Senate's version. *See* H.R. Rep. No. 95-1714, at 21-22. That is, Congress ultimately kept the House's findings that racial minorities suffer social disadvantage but dropped the language that transformed that observation into a presumption. The conferees stressed that Congress was not granting the SBA authority "merely to channel contracts at a random pace to a preconceived group of eligibles for the sake of social or political goals." *Id*. at 21-23.

*Second*, why would Congress announce a racial presumption in the roundabout way Rothe envisions when it straightforwardly enacted a racial presumption elsewhere in the Small Business Act? *See Russello v. United States*, 464 U.S. 16, 23 (1983) (When "Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (citation omitted)). In section 8(d) of the Small Business Act—a provision not at issue in this case—Congress directed agencies to include in their prime contracts a clause for subcontracts that states, in part, that the "contractor shall presume that socially and economically disadvantaged individuals include Black Americans, Hispanic Americans, Native Americans, Asian Pacific Americans, and other minorities, and any other individual found to be disadvantaged by the Administration pursuant to section 8(a) of the Small Business Act." 15 U.S.C. § 637(d)(3)(C)(ii). Section 8(d)'s express, race-based presumption was part of the Department of Transportation's affirmative-action program at issue in *Adarand Constructors, Inc. v. Peña*, to which the Supreme Court applied strict scrutiny. 515 U.S. at 205-07, 213. Whatever Congress's reasons for directing private businesses to use race-based criteria under section

8(d)'s subcontracting clause, Congress authorized more nuanced implementation by the agency under section 8(a).

Other contracting programs likewise confirm that, when Congress wants to enact expressly race-based preferences, it knows how to do so. Take, for example, the Public Works Employment Act of 1977, Pub. L. 95-28, 91 Stat. 116 (1977), which Congress enacted just a year before section 8(a). It required that ten percent of federal funds granted to localities for public works projects be allocated for contracts with "minority business enterprises," which Congress defined as businesses owned by "minority group members," *i.e.*, "citizens of the United States who are Negroes, Spanish-speaking, Orientals, Indians, Eskimos, and Aleuts." *See Fullilove v. Klutznick*, 448 U.S. 448, 454 (1980) (opinion of Burger, C.J.) (quoting 42 U.S.C. § 6705(f)(2)).[3] In contrast to section 8(d) and the Public Works Employment Act, section 8(a) benefits "socially disadvantaged" individuals, as defined by their experience of discrimination and not just their racial or ethnic group membership. 15 U.S.C. § 637(a)(5).

It is worth noting that Congress enacted section 8(a) in 1978, a generation before the Supreme Court held that even "benign" congressional classification by race triggers strict judicial scrutiny. It was not until 1995 that the Supreme Court held that expressly race-based preferences in federal contracting are subject to strict scrutiny. *See Adarand*, 515

---

[3] The Supreme Court in *Fullilove* sustained the Public Works Employment Act's minority set-aside provision against an equal protection challenge on grounds that the Court in *Adarand* substantially clarified. *See Adarand*, 515 U.S. at 236 (holding race-based affirmative action subject to strict judicial scrutiny, and noting that, "to the extent (if any) that *Fullilove* held federal racial classifications to be subject to a less rigorous standard, it is no longer controlling").

U.S. at 227. Congress's use of the facially race-neutral social-disadvantage criteria in section 8(a) therefore cannot be cast as an effort to do covertly what Congress believed it could not do overtly. Rather, it is best understood as a considered effort to aid struggling entrepreneurs of all races who faced bias-induced barriers. In that respect, section 8(a) differs from expressly race-based statutes courts have subjected to strict scrutiny. *See, e.g.*, *Croson*, 488 U.S. at 478 (local contracting set-aside program identified eligible businesses as those owned by "minority group members," specifically, "[c]itizens of the United States who are Blacks, Spanish-speaking, Orientals, Indians, Eskimos, or Aleuts"); *Rothe Dev. Corp. v. Dep't of Def.*, 545 F.3d 1023, 1027, 1050 (Fed. Cir. 2008) (program incorporating section 8(d)'s express racial presumption subject to strict scrutiny); *O'Donnell Constr. Co. v. District of Columbia*, 963 F.2d 420, 422 (D.C. Cir. 1992) (preliminarily enjoining program allocating 35% of D.C. contracts to "minority business enterprises," where "minority" meant "Black Americans, Native Americans, Asian Americans, Pacific Islander Americans, and Hispanic Americans, who by virtue of being members of the foregoing groups, are economically and socially disadvantaged because of historical discrimination practiced against these groups by institutions within the United States of America").

*Third*, both the Supreme Court and this court's discussions of the 8(a) program have identified the regulations—not the statute—as the source of its racial presumption. In *Adarand*, the Supreme Court noted that section 8(d) of the Small Business Act contains a race-based presumption. 515 U.S. at 207. But in describing the 8(a) program, the *Adarand* Court explained that the agency (not Congress) presumes that certain racial groups are socially disadvantaged and cited an SBA regulation (not the statute):

"The SBA presumes that black, Hispanic, Asian Pacific, Subcontinent Asian, and Native Americans . . . are 'socially disadvantaged.'" *Id*. (quoting 13 C.F.R. § 124.105(b)(1)); *see also Fullilove*, 448 U.S. at 463 (referring to "existing administrative programs promoting minority opportunity in government procurement, particularly those related to § 8(a) of the Small Business Act of 1953").

We said something similar in *DynaLantic*, 115 F.3d 1012. The question there was whether a business that was neither socially nor economically disadvantaged had standing to challenge the constitutionality of the 8(a) program, including the regulatory presumption of social disadvantage. *Id*. at 1013. We explained that "*SBA regulations* presume that, '[i]n the absence of evidence to the contrary,' members of certain racial or ethnic groups—including Black, Hispanic, Native, Asian Pacific, and Subcontinent Asian Americans— are socially disadvantaged." *Id*. (emphasis added) (quoting 13 C.F.R. § 124.105(b)(1)). And we referred specifically to the program's "*regulatory* presumption." *Id*. at 1017 (emphasis added).

Our conclusion that the statute lacks an express racial classification is also consistent with the holding of *DynaLantic*. Over the government's objections, we held that the plaintiff in *Dynalantic* had standing. *Id*. at 1013, 1018. The government had argued that, even if the plaintiff's challenge to the race-based regulatory presumption succeeded, the statutory basis for the program would stand because it was not race-based, and the plaintiff would continue to face competition from firms that qualified for participation under the race-neutral statutory criteria. *Id*. at 1017. Therefore, the government asserted, even success on its equal protection claim could not redress the plaintiff's injury. *Id*. We thought the government's reading of the

statute was "rather dubious" and were unwilling to "assume, certainly at [the pleading] stage of the litigation, that the statute itself [wa]s invulnerable" to constitutional challenge. *Id*.; *but see id.* at 1018 (Edwards, C.J., dissenting) ("The statutory set-aside is not limited in terms of race, so it does not prescribe a benefit that is available only to members of racial minorities."). But, critically, we did not reject the government's position; as the dissent correctly acknowledges, Dissent at 8, there was no need to reach it. "[I]f a favorable decision would lead only to the invalidation of the regulations . . . , Dynalantic's injury would still be considerably mitigated," so we left open the question whether 8(a) of the statute contained a racial classification. *Id*. at 1017 (majority op.); *see United States v. Wade*, 152 F.3d 969, 973 (D.C. Cir. 1998) (explaining that, even if an earlier opinion could be read to reach the relevant issue, "[b]ecause that issue was not before the court, its overly broad language would be *obiter dicta* and not entitled to deference").

*Fourth*, as noted above, in its first implementation of the statutory definition of social disadvantage on the heels of its enactment in 1978, the agency required case-by-case determinations of social disadvantage. The agency used no race-based presumption, but specifically required evaluation of the claimed social disadvantage of any individual business owner seeking to qualify for the section 8(a) program, whether or not that person was a member of a racial or ethnic minority group deemed to be socially disadvantaged. The dissent suggests that the statute's constitutional defect lies in its putative failure to "provide that 'persons' are socially disadvantaged because of their *individual* experiences of discrimination." Dissent at 5. But that is precisely what the statute does provide. The agency's initial implementing regulation illustrates how the statute might reasonably be

enforced in the race-neutral manner that the dissent believes the statute forecloses. *Id.*

Finally, the reality that Congress enacted section 8(a) with a consciousness of racial discrimination in particular as a source of the kind of disadvantages it sought to counteract does not expose the statute to strict scrutiny. Congress intended section 8(a) to secure "the opportunity for full participation in our free enterprise system [for] socially and economically disadvantaged persons" and to "improve the functioning of our national economy." 15 U.S.C. § 631(f)(1)(A). To be sure, Congress foresaw that "the primary beneficiaries of this program will be minorities." H.R. Rep. No. 95-1714, at 22. But Rothe does not argue that the statute could be subjected to strict scrutiny, even if it is facially neutral, on the basis that Congress enacted it with a discriminatory purpose. *See Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979). In the absence of such a claim, we will not subject a facially race-neutral statute to strict scrutiny. Mere foreseeability of racially disparate impact, without invidious purpose, does not trigger strict constitutional scrutiny. *Id.* ("'Discriminatory purpose'. . . implies more than intent as volition or intent as awareness of consequences.").

Policymakers may act with an awareness of race—unaccompanied by a facial racial classification or a discriminatory purpose—without thereby subjecting the resultant policies to the rigors of strict constitutional scrutiny. The Supreme Court has specified that "race may be considered in certain circumstances and in a proper fashion . . . . [M]ere awareness of race in attempting to solve the problems facing inner cities does not doom that endeavor [to foster diversity and combat racial isolation] at the outset." *Tex. Dep't Hous. & Cmty. Affairs v. Inclusive Cmtys. Project*,

135 S. Ct. 2507, 2525 (2015); *see Shaw v. Reno*, 509 U.S. 630, 646 (1993) (recognizing that certain forms of "race consciousness do[] not lead inevitably to impermissible race discrimination"); *Parents Involved*, 551 U.S. at 789 (Kennedy, J., concurring) (noting several ways of pursuing diversity in education, such as strategic site selection and targeted recruitment, unlikely to trigger strict scrutiny because those "mechanisms are race-conscious but do not lead to different treatment based on a classification that tells each student he or she is to be defined by race").

As Justice Scalia wrote in his concurring opinion in *City of Richmond v. J.A. Croson Company*,

> A State can, of course, act "to undo the effects of past discrimination" in many permissible ways that do not involve classification by race. In the particular field of state contracting, for example, it may adopt a preference for small businesses, or even for new businesses—which would make it easier for those previously excluded by discrimination to enter the field. Such programs may well have racially disproportionate impact, but they are not based on race.

488 U.S. 469, 526 (1989). The Supreme Court's ensuing affirmative action decisions confirm that point by countenancing, and characterizing as "race neutral," alternatives designed to advance the same ends as affirmative action programs but that do not rely on racial criteria. *See, e.g.*, *Fisher*, 133 S. Ct. at 2420 ("[S]trict scrutiny imposes on the university the ultimate burden of demonstrating, before turning to racial classifications, that available, workable race-neutral alternatives do not suffice."). Congress, in crafting section 8(a), was attentive to form as it sought to pursue

plainly permissible ends. The lawmakers chose to advance equality of business opportunity and respond to discrimination by conditioning participation in the program on an individual's experience of racial, ethnic, or cultural bias, rather than racial identity. We will not treat as constitutionally suspect an effort that avoids the hazards equal protection doctrine guards against.

E.

Because the statute does not trigger strict scrutiny, we need not and do not decide whether the district court correctly concluded that it is narrowly tailored to meet a compelling interest. *Rothe*, 107 F. Supp. 3d at 206-11.[4] We instead consider whether it is supported by a rational basis. *See Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 358-61 (2009) (upholding under rational-basis review a statutory provision after determining that strict scrutiny does not apply). It plainly is, for "it bears a rational relation to some legitimate end." *Romer v. Evans*, 517 U.S. 620, 631 (1996). The statute aims to remedy the effects of prejudice and bias that impede business formation and development and suppress fair

---

[4] By the same token, we do not reach the parties' debate over whether to review Rothe's facial equal protection challenge under the standard set forth in *United States v. Salerno*, 481 U.S. 739, 745 (1987), or a less demanding standard. *Compare Rothe Dev. Corp. v. Dep't of Def.*, 413 F.3d 1327, 1337-38 (Fed. Cir. 2005) (explaining that *Salerno*'s "no set of circumstances" standard is of "limited relevance" in analyzing a facial equal protection challenge to which strict scrutiny applies), *with Sherbrooke Turf, Inc. v. Minn. Dep't of Transp.*, 345 F.3d 964, 971 (8th Cir. 2003) ("Appellants' facial challenge to the DBE program requires us to look carefully at DOT's regulations to determine whether they may be constitutionally applied under *any* set of factual circumstances." (citing *Salerno*, 481 U.S. at 746)).

competition for government contracts. *See* S. Rep. No. 95-1070, at 2.

Counteracting discrimination is a legitimate interest; indeed, in certain circumstances, it qualifies as compelling. *See Shaw v. Hunt*, 517 U.S. 899, 909 (1996); *Croson*, 488 U.S. at 492 (plurality op.) ("It is beyond dispute that any public entity, state or federal, has a compelling interest in assuring that public dollars, drawn from the tax contributions of all citizens, do not serve to finance the evil of private prejudice."). And the statutory scheme is rationally related to that end. Congress conditioned participation in the 8(a) program on social disadvantage, defined as an individual's experience of discrimination or bias. *See* 15 U.S.C. § 637(a)(5). Because "[s]mall businesses owned and controlled by socially and economically disadvantaged individuals (most of whom are minority) receive a disproportionately small share of Federal purchases," H.R. Rep. No. 100-460, at 18 (1987), the program offers those participants technical assistance and the opportunity to bid on federal contracts in a sheltered market. The point of such sheltered markets is to provide disadvantaged business owners opportunities to gain management experience and build performance records—chances they might otherwise lose to competitors unhindered by the disadvantages they have experienced as a result of bias and prejudice. The program therefore provides the benefits socially and economically disadvantaged individuals most need to participate on fair terms in the national economy.

## II.

Rothe also appeals the district court's decisions, pursuant to Federal Rule of Evidence 702, on the admissibility of the reports and deposition testimony of the government's expert witnesses and the inadmissibility of the reports and deposition

testimony of Rothe's experts. In the context of the parties' cross-motions for summary judgment, each side proffered their expert evidence as probative of whether the government has a compelling interest that would justify use of race in determining social disadvantage under the 8(a) program. We decline to review the district court's admissibility determinations, for we would affirm district court's grant of summary judgment to the defendants even if the district court abused its discretion in making those determinations. The expert witness testimony is not necessary to, nor in conflict with, our conclusion that section 8(a) is subject to and survives rational-basis review.

## III.

Finally, Rothe contends that section 8(a) is an unconstitutional delegation of legislative power. The Constitution "permits no delegation of [legislative] powers, and so . . . when Congress confers decisionmaking authority upon agencies *Congress* must lay down by legislative act an intelligible principle to which the person or body authorized to act is directed to conform." *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 472 (2001) (internal citations, quotation marks, and brackets omitted). According to Rothe, "Congress cannot delegate the power to racially classify. Alternatively, even if Congress can delegate it, the delegation here lacks the requisite intelligible principle." Appellant Br. 53.

Rothe's first argument is premised on the idea that Congress has created a racial classification. As we have explained, Congress has done no such thing. Rothe's alternative argument also fails. Congress's delegation of power to the SBA to enter into contracts with other federal agencies and subcontract with "socially and economically

disadvantaged small business concerns," 15 U.S.C. § 637(a)(1)(A) & (B), "is no broader than other delegations that direct agencies to act in the 'public interest,' or in a way that is 'fair and equitable,' or in a manner 'requisite to protect the public health,' or when 'necessary to avoid an imminent hazard to the public safety,'" each of which the Supreme Court has upheld against nondelegation challenges. *Nat'l Mar. Safety Ass'n v. Occupational Safety & Health Admin.*, 649 F.3d 743, 755 (D.C. Cir. 2011) (citations omitted). Congress's definition of "socially disadvantaged" in 15 U.S.C. § 637(a)(5) provides further "intelligible" guidance to the SBA to implement the 8(a) program.

* * *

For the foregoing reasons, we affirm the district court's grant of summary judgment to the government defendants.

*So ordered.*

KAREN LECRAFT HENDERSON, *Circuit Judge*, concurring in part and dissenting in part:

> *Judges must beware of hard constructions and strained inferences; for there is no worse torture than the torture of the laws.*
>
> Sir Francis Bacon
> *Essays*, "Of Judicature," LVI

My colleagues hold that the provisions of the Small Business Act (Act) at issue in this case are "facially race-neutral." *See* Maj. Op. at 3. I disagree. And I am in good company. The appellant believes the statute contains a racial classification.[1] The appellees believe the statute contains a racial classification.[2] The district court held that the statute contains a racial classification.[3] The Small Business Administration's (SBA) implementation follows from its

---

[1] *See* Appellant's Br. 2–3 (statutory definition of "socially disadvantaged," the "presumption that all individuals who are members of certain racial groups are socially disadvantaged," and the "goal to award a certain percentage" of government contracts "to socially disadvantaged small business concerns" together "comprise 'section 8(a)'s racial classification' ").

[2] *See* Appellees' Br. 16 ("Strict scrutiny applies because Section 8(a) employs a race-conscious rebuttable presumption to define socially disadvantaged individuals.").

[3] *Rothe Dev., Inc. v. Dep't of Def.*, 107 F. Supp. 3d 183, 207 (D.D.C. 2015) ("There is no question that 'racial classifications' *such as the ones at issue here* 'are constitutional only if they are narrowly tailored measures that further compelling governmental interests.' " (emphasis added) (alteration and quotation marks omitted) (quoting *DynaLantic Corp. v. Dep't of Def.*, 885 F. Supp. 2d 237, 250 (D.D.C. 2012))).

view that the statute contains a racial classification.[4]  And to top it off, *this court* found my colleagues' approach "rather dubious" nearly twenty years ago.[5]  The chorus swells.

But we need not take the chorus's word for it.  Their voices simply confirm what the language of the Act makes plain enough.  The majority's analysis, in contrast, is fundamentally flawed, assuming that a statute that does not classify *exclusively* on the basis of race must necessarily be

---

[4]  When the SBA first promulgated the regulatory presumption on December 1, 1980, it stated: "Congress did not mean to bestow 8(a) program benefits indiscriminately on small business persons." Definition of Social Disadvantage, 45 Fed. Reg. 79,413, 79,414 (Dec. 1, 1980).  "Rather, it sought to single out for special treatment those persons who have had greatest difficulty, through no fault of their own, in achieving a competitive position in the business world.  Hence, *its designation of members of certain minority groups as socially disadvantaged*." *Id.* (emphasis added). The SBA also made plain that, in promulgating the regulation, it "adhered to the legislative intent behind Pub. L. 95-507: that *statutorily designated racial and ethnic minorities* be the primary beneficiaries of the 8(a) program, but that other disadvantaged individuals be eligible for the program." *Id.* at 79,413 (emphasis added).

[5]  That case involved a company's standing to pursue a constitutional challenge to the section 8(a) program.  *See DynaLantic Corp. v. Dep't of Def.*, 115 F.3d 1012, 1013 (D.C. Cir. 1997).  The government argued "that the 8(a) statute is not itself race-conscious; only the implementing SBA regulations are." *Id.* at 1017.  The majority found "the government's statutory analysis [to be] rather dubious." *Id.*  "[T]he Act," the court went on, "includes as a congressional *finding* that certain *racial* groups—the same groups as are identified in [the SBA regulation]—are socially disadvantaged." *Id.* (second emphasis added) (citing 15 U.S.C. §§ 631(f)(1)(B), (C)).

"facially race-neutral." Maj. Op. at 3. The majority's appeals to statutory context, legislative history and relevant case law likewise miss the mark. On this issue, I respectfully part company with my colleagues.[6]

## I. Section 8(a) of the Small Business Act Contains a Racial Classification

"Most laws classify," *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 271 (1979), and the Small Business Act is no exception. Indeed, the section 8(a) program at issue classifies in all sorts of ways; as an example, for certain government contracts, it offers a preference to businesses that are "small" if owned by "socially disadvantaged" individuals who are also "economically disadvantaged." *See* 15 U.S.C. § 637(a). The issue here is whether section 8(a)'s classifications are, on their face, race neutral, *see* Maj. Op. at 3, or if they instead "distribute[] burdens or benefits" on the basis of race, *see Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 720 (2007). The inquiry boils down to this: Does the Act provide members of certain racial groups an advantage in qualifying for section 8(a)'s contract preference

---

[6] I concur in the affirmance of summary judgment to the government on the non-delegation issue. *See* Maj. Op. at 27–28. My colleagues also conclude that we need not review the district court's evidentiary decisions because "[t]he expert witness testimony is not necessary to, nor in conflict with, our conclusion that section 8(a) is subject to and survives rational-basis review." *Id.* at 27. Because I believe we should apply strict scrutiny rather than rational-basis review to the challenged provisions of the Act, however, I disagree with my colleagues on the issue. Nevertheless, my dissent is limited to identifying the correct standard of review rather than its application and therefore the district court's evidentiary holdings are beyond its scope. *See infra n.8.*

by virtue of their race? A review of its key provisions manifests that it does.

Section 8(a)(5) is the starting point. It defines "socially disadvantaged individuals" as "those who have been subjected to *racial* or ethnic *prejudice* or cultural bias because of their identity as a member of a group without regard to their individual qualities." 15 U.S.C. § 637(a)(5) (emphases added). Moreover, two other statutory provisions confirm that section 8(a)(5) of the Act (and not only the SBA's implementing regulations) favors certain races in qualifying for participation in the section 8(a) program.

The first of these provisions is section 8(a)(8). It provides that "[a]ll determinations made pursuant to paragraph [8(a)(5)] with respect to whether a *group* has been subjected to prejudice or bias shall be made by the Administrator after consultation with the Associate Administrator for Minority Small Business and Capital Ownership Development." *Id.* § 637(a)(8) (emphasis added). The use of "group" here is key. *Id.* It confirms that the focus of the inquiry under section 8(a)(5) is a "determination[]" of whether an individual is "socially disadvantaged" by virtue of his membership in a *group* that has suffered racial/ethnic "prejudice" or cultural "bias." *See id.* § 637(a)(5), (8). It is *group* membership—and the prejudice or bias the group has experienced—that triggers social disadvantage. *See id.* If, as my colleagues conclude, *see* Maj. Op. at 7–9, section 8(a)(5) instead demanded an inquiry into an individual's own experience of discrimination, section 8(a)(8) would read something like "all determinations made pursuant to paragraph [8(a)(5)] with respect to whether *an individual* has been subject to prejudice or bias . . . ." But it does not. Instead, the Congress plainly made the "group" criterion preeminent.

Why that is so becomes abundantly clear when sections 8(a)(5) and 8(a)(8) are considered in light of section 2(f) of the Act. Section 2(f) is worth quoting at length:

> [W]ith respect to the [SBA's] business development programs the Congress finds—
>
> (A) that the opportunity for full participation in our free enterprise system by socially and economically disadvantaged persons is essential if we are to obtain social and economic equality for such persons and improve the functioning of our national economy;
>
> (B) that many such persons are socially disadvantaged because of their identification as members of certain groups that have suffered the effects of discriminatory practices or similar invidious circumstances over which they have no control; [and]
>
> (C) that such groups include, but are not limited to, Black Americans, Hispanic Americans, Native Americans, Indian tribes, Asian Pacific Americans, Native Hawaiian Organizations, and other minorities . . . .

15 U.S.C. § 631(f)(1)(A)–(C) (footnote omitted).

Like section 8(a)(8), section 2(f)(1)(B) connects social disadvantage to membership in certain "groups." *Id.* § 631(f)(1)(B). Notably, section 2(f)—like 8(a)(8)—does not provide that "persons" are socially disadvantaged because of their *individual* experiences of discrimination. Rather, they are socially disadvantaged "because of their identification as

members of certain *groups* that have suffered the effects of discriminatory practices or similar invidious circumstances over which they have no control." *Id.* (emphasis added). The message is clear—groups suffer discrimination and therefore persons who are members of those groups are socially disadvantaged. *See id.*

Section 2(f) also designates "Black Americans, Hispanic Americans, Native Americans, Indian tribes, Asian Pacific Americans, Native Hawaiian Organizations, and other minorities" as "such groups" that "have suffered the effects of discriminatory practices or similar invidious circumstances over which they have no control." *Id.* § 631(f)(1)(B)–(C). When read *in pari materia*, these two provisions are crystal clear: if an individual is a "Black American[], Hispanic American[], Native American[], [member of an] Indian tribe[], Asian Pacific American[], [or] [member of a] Native Hawaiian Organization[]," the individual is "socially disadvantaged" because those "groups" have "suffered the effects of discriminatory practices or similar invidious circumstances." *Id.* Likewise with "other minorities"—if an individual is a member of an unlisted minority group, he is deemed "socially disadvantaged." *Id.*

In my view, then, the Congress has set a floor for participation in the section 8(a) program: members of the statutorily identified groups are deemed to be "socially disadvantaged." *See id.* Under section 8(a)(8), the SBA may, over time, determine that "a group has been subjected to prejudice or bias" and add it to the running list. *Id.* § 637(a)(8). This is why section 8(a)(8) directs the SBA to focus on groups (not individuals) that have experienced discrimination in making its social-disadvantage decisions, *id.*—the Congress itself was focused on the discrimination experienced by groups in making its own findings about

social disadvantage, *see id.* § 631(f)(1)(B)–(C). Nothing in the statute prohibits an individual from making a showing that his membership in a group *not* listed has made him "subject[] to racial or ethnic prejudice or cultural bias."[7] *Id.* § 637(a)(5). But "Black Americans, Hispanic Americans, Native Americans, Indian tribes, Asian Pacific Americans, [and] Native Hawaiian Organizations" are statutorily deemed to be "socially disadvantaged" under the Act because the Congress itself has declared that "members of [these] groups . . . have suffered the effects of discriminatory practices or similar invidious circumstances over which they have no control." *Id.* § 631(f)(1)(B)–(C).

An example may help to illustrate the Act's operation. The SBA's implementing regulations, tracking the Act, *presume* that members of certain racial groups are socially disadvantaged but individuals who are "not members of [the] designated groups . . . must establish individual social disadvantage by a preponderance of the evidence." *See* 13 C.F.R. § 124.103(b)–(c) (prescribing "a rebuttable

---

[7] Because section 2(f) limits the reach of groups that "have suffered the effects of discriminatory practices or similar invidious circumstances" to "other minorities," 15 U.S.C. § 631(f)(1)(B)–(C), a racial non-minority (*i.e.*, a white) plainly cannot qualify for the program based on "racial . . . prejudice," *id.* § 637(a)(5). A white would have to show social disadvantage based on his membership in a minority group that has experienced "cultural bias" or "ethnic prejudice." *Id.* The legislative history provides one example—"a poor Appalachian white person who has never had the opportunity for a quality education or the ability to expand his or her cultural horizons." H.R. Rep. No. 95-1714, at 22 (1978) (Conf. Rep.). But the fact that a white *can* qualify for the section 8(a) preference does not render the statute race-neutral. *See infra* 15–18.

presumption" that members of "designated groups" "are socially disadvantaged"). "Black Americans" currently lead the list of designated groups, the members of which are presumed to be socially disadvantaged. *Id.* § 124.103(b)(1). Assume, however, that the SBA were to decide that black Americans as a group are no longer subject to prejudice or bias and therefore black Americans as a group are no longer entitled to the regulatory presumption. Could the SBA remove them from the list of presumed socially disadvantaged groups and require instead that every individual black American establish *individual* social disadvantage by a preponderance of the evidence? I think not, because such action would conflict with the congressional finding that "Black Americans" *as a group* are socially disadvantaged, *see* 15 U.S.C. § 631(f)(1)(C), and the SBA would have exceeded its statutory authority. Instead, congressional action would be required to "delist" any of the statutorily designated minority groups. *See, e.g.*, *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) ("It is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress.").

I am far from the first to read the Act this way. We suggested this relationship between the statute and the race-based regulatory presumption—that the race-based statute demands race-based regulations—in *DynaLantic Corp. v. Department of Defense*. *See* 115 F.3d 1012, 1017 n.3 (D.C. Cir. 1997). Although we did not *decide* in *DynaLantic* whether the statute contains a racial classification, we noted that "[t]he statute itself actually might *require* race-conscious regulations." *Id.* (emphasis in original). We then cited 15 U.S.C. §§ 631(f)(1)(B) and (C), followed by a parenthetical stating, "(congressional finding that certain racial groups are socially disadvantaged)." *Id.* We found the Defense Department's contention to the contrary—"that the 8(a)

statute is not itself race-conscious"—to be "rather dubious," explaining that "the Act includes as a congressional *finding* that certain racial groups—the same groups as are identified in [the regulation]—are socially disadvantaged." *Id.* at 1017 (emphasis in original). "In this respect," we said, "the 8(a) provisions are much like the program in [*Regents of the University of California v.*] *Bakke*: 'a minority enrollment program with a secondary disadvantage element.'" *Id.* (quoting *Regents of the Univ. of Cal. v. Bakke*, 438 U.S. 265, 281 n.14 (1978)).

Here, the appellees' reading of the relationship between the statute and regulations echoes our suggested reading in *DynaLantic*, 115 F.3d at 1017 n.3. They did not raise any no-racial-classification-in-the-statute defense in their briefs and, when asked at oral argument about a potential distinction between the regulation's racial presumption and the alleged lack of one in the Act, the appellees' counsel held fast to her position that the race-based SBA regulations flow directly from the statute. *See* Oral Arg. Tr. 25:6–13 ("[W]hat we're arguing is that SBA is just carrying out what is in the statute, that Congress provided the standards in the statute, and SBA in the regulations are [sic] just applying what's in the statute, the standards in the statute."); *see id.* at 26:3–7 ("[T]he SBA is just implementing what Congress has in the statute, so you have to see what Congress knew, and the SBA is just following what Congress has said.").

The moral of the story is that the congressional findings set forth in section 2(f) of the Act constrain the SBA's discretion in making "socially disadvantaged" determinations under section 8(a)(5), *see* 15 U.S.C. § 637(a)(5), and those determinations are tied—*by statute*—to group, not individual, discrimination, *see id.* § 637(a)(8). One of those constraints—and a critical one—is that the Congress has

designated certain racial groups and other minorities as socially disadvantaged. *See id.* § 631(f)(1)(C). Accordingly, if not rebutted, the SBA *must* presume members of those groups are socially disadvantaged.

In my view, section 8(a) contains a paradigmatic racial classification. The Congress has "distribute[d] . . . [a] benefit" to members of statutorily-designated racial groups *because of* their membership therein, *see Parents Involved*, 551 U.S. at 720; namely, they are not required to meet the same standard in establishing their eligibility to participate in the section 8(a) program that members of non-minority races must satisfy. Accordingly, I agree with the parties and the district court that we should apply strict scrutiny in determining whether the section 8(a) program violates Rothe's right to equal protection of the laws.[8]

---

[8] According to the majority, I "believe[] there is only one way to understand the statute . . . and thus do[] not address our responsibility to avoid constitutional problems where a reasonable statutory reading so permits." Maj. Op. at 16. But where there *is* only one well-founded way to read a statute, it is emphatically not our responsibility to avoid constitutional difficulties. *See, e.g.*, *McFadden v. United States*, 135 S. Ct. 2298, 2306–07 (2015) (constitutional-avoidance canon "has no application in the interpretation of an unambiguous statute" (internal quotation marks omitted)). Here, however, the majority's invocation of the canon is particularly flimsy for two reasons: First, the canon is ultimately "a means of giving effect to congressional intent, not of subverting it," *Clark v. Martinez*, 543 U.S. 371, 382 (2005), and, not to belabor the point, but if the Congress did not intend section 8(a) to classify on the basis of race, one wonders why it envisioned that "determinations [would be] made . . . with respect to whether a group has been subjected to prejudice or bias," *see* 15 U.S.C. § 637(a)(8), or found that certain racial groups "have suffered the effects of discriminatory practices or similar invidious

## II. The Majority Misreads Section 8(a)

I believe the majority's race-neutral reading is flawed in at least three major respects. First, it fails to give *in pari materia* reading to sections 8(a)(5), 8(a)(8) and 2(f). *See* Maj. Op. at 11–14. Second, it mistakenly assumes that, because a member of a non-minority race (*i.e.*, a white) can participate in the section 8(a) program, the statute must be race-neutral. *See* Maj. Op. at 7–9. Third, the legislative history, statutory context and relevant case law it cites do not support its interpretation. *See* Maj. Op. at 17–23. I address each in turn.

---

circumstances over which they have no control," *see id.* § 631(f)(1)(B)–(C). But second, and perhaps more fundamentally, "the purpose of strict scrutiny is to 'smoke out' illegitimate uses of race by assuring that the legislative body is pursuing a goal important enough to warrant use of a highly suspect tool." *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493 (1989) (plurality opinion). Those efforts would be severely hamstrung if it were the "responsibility," Maj. Op. at 16, of courts to force doubtful readings on statutes to avoid conducting that "searching examination," *Fisher v. Univ. of Texas at Austin*, 133 S. Ct. 2411, 2419 (2013). I recognize that, at times, courts have been less than unequivocal in specifying a tier of scrutiny when greater clarity plainly would not affect the statute's constitutionality, *see, e.g.*, *Tuan Anh Nguyen v. I.N.S.*, 533 U.S. 53, 60–61 (2001); however, I cannot say at this early stage whether that would be true here. Nonetheless, recognizing that the Supreme Court, at times, has also thought it important to specify the degree of scrutiny even when doing so would not change the outcome, *see City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 435 (1985), I see little reason to "avoid," Maj. Op. at 16, the threshold question of how searching our review should be.

A. *Section 2(f) Should Be Given Effect*

The majority discounts the significance of section 2(f) of the Act by emphasizing that it "is located in the findings section of the statute, not in the operative provision that sets forth the program's terms and the criteria for participation." Maj. Op. at 12. There are several problems with this approach.

First, our precedent makes plain that, "although the language in the preamble of a statute is 'not an operative part of the statute,' it may aid in achieving a 'general understanding' of the statute." *Wyo. Outdoor Council v. U.S. Forest Serv.*, 165 F.3d 43, 53 (D.C. Cir. 1999) (quoting *Ass'n of Am. R.Rs. v. Costle*, 562 F.2d 1310, 1316 (D.C. Cir. 1977)). Indeed, we have found an agency's decision arbitrary and capricious when it construed a statute without addressing "important language" in congressional findings. *See Ass'n of Am. R.Rs. v. Surface Transp. Bd.*, 237 F.3d 676, 680–81 (D.C. Cir. 2001). Yet the majority brushes off section 2(f). *See* Maj. Op. at 12–13. I believe its approach conflicts with our above-cited case law.

Second, even those cases that discount reliance on congressional findings do so only if a party uses the findings to manufacture ambiguity in an otherwise unambiguous statute. *See, e.g.*, *Costle*, 562 F.2d at 1316 ("Where the enacting or operative parts of a statute are *unambiguous*, the meaning of the statute cannot be controlled by language in the preamble." (emphasis added)); *id.* ("We find the reference[s] [in the operative portion of the statute] to be unambiguous and, therefore, do not look to the preamble for guidance as to the legislative intent."); *accord Nat'l Wildlife Fed'n v. EPA*, 286 F.3d 554, 570 (D.C. Cir. 2002); *see also Jurgensen v. Fairfax Cnty., Va.*, 745 F.2d 868, 885 (4th Cir. 1984) (no

need to look to findings if relevant statute is "clear and unambiguous"). Despite the majority's protestations to the contrary, *see* Maj. Op. at 12–13, the language of section 8(a) is not unambiguous. *See Costle*, 562 F.2d at 1316. Moreover, reading sections 8(a)(5) and 8(a)(8) together with section 2(f) to create a statutory presumption that the designated groups are socially disadvantaged does not conflict with either "operative" provision. Under this reading, all three provisions say the same thing: membership in a minority group that, according to the Congress, has experienced prejudice or bias produces social disadvantage. The same is not true of the majority's reading, which ignores section 2(f) and fails to reconcile its hyper-individualized reading of section 8(a)(5) with the Congress's group-focused directive in section 8(a)(8). *See* Maj. Op. at 11–16.

Third, to call the congressional findings here a preamble is "somewhat of a misnomer." *Ivy Sports Med., LLC v. Burwell*, 767 F.3d 81, 93 (D.C. Cir. 2014) (Pillard, J., dissenting). Traditionally, a "preamble" to a statute is a "prefatory explanation or statement" that "customarily precedes the enacting clause[9] in the text of a bill, and consequently is frequently understood not to be part of the law." NORMAN SINGER & SHAMBIE SINGER, 1A SUTHERLAND

---

[9] An enacting clause is "the part of [an] act's body stating precise action taken by the legislature." NORMAN SINGER & SHAMBIE SINGER, 1A SUTHERLAND STATUTES & STATUTORY CONSTRUCTION § 20:6 (7th ed. 2008). The enacting clause in federal legislation—"*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled*"—has remained remarkably consistent throughout the nation's history. *Compare* Native American Children's Safety Act, Pub. L. No. 114-165, 130 Stat. 415, 415 (June 3, 2016), *with* Act of June 1, 1789, ch. 1, 1 Stat. 23, 23.

STATUTES & STATUTORY CONSTRUCTION § 20:3 (7th ed. 2008). It was just such a "preamble" the Supreme Court discussed in *Yazoo & M.V.R. Co. v. Thomas*, 132 U.S. 174 (1889), a case in which the Mississippi legislature had included a lengthy "whereas" statement before the enacting clause in legislation that chartered a railroad. *See* Act of February 17, 1882, ch. 541, 1882 Miss. Laws 838, 838. It was in *that* context—where "the preamble [was] no part of the act"—that the Court said it could "not enlarge or confer powers, nor control the words of the act, unless they are doubtful or ambiguous." *Yazoo*, 132 U.S. at 188. In *Association of American Railroads v. Costle*, we applied the same rule to congressional findings, 562 F.2d at 1316, even though those findings appeared *after* the enacting clause, *see* Noise Control Act of 1972, Pub. L. No. 92-574, § 2, 86 Stat. 1234, 1234.[10] In doing so, we cited only one case—*Yazoo. See Costle*, 562 F.2d at 1316 n.30. We never acknowledged, however, that the preamble in the Mississippi legislation at issue in *Yazoo* differed from the *enacted* congressional findings in the Noise Control Act of 1972. Our cases citing *Costle* have likewise not noted the critical difference, primarily because they involved administrative, not statutory, preambles. *See, e.g.*, *Nat'l Wildlife Fed'n*, 286 F.3d at 569–70; *Wyo. Outdoor Council*, 165 F.3d at 54.

In my view, then, we should read *Costle* with a grain of salt; at the very least, we should be cautious before applying the Supreme Court's admonition about the minimal effect of

---

[10] The "preamble," if any, in the Noise Control Act of 1972 more closely resembles a title, to wit: "An Act [t]o control the emission of noise detrimental to the human environment, and for other purposes." Noise Control Act of 1972, Pub. L. No. 92-574, 86 Stat. 1234, 1234. The text of the law, including the enacting clause and the findings, then follows. *See id.* §§ 1–18.

an *unenacted* preamble to provisions the Congress saw fit to *enact* into law. I read *Costle* to mean that enacted findings do not "control[]" if they conflict with unambiguous, so-called "operative" provisions of a particular statute, *see Costle*, 562 F.2d at 1316, but *Costle* does not hold that enacted findings are only an interpretative last resort. Instead, we must attempt to read the entire Act—including duly enacted findings—as one "harmonious whole." *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132–33 (2000) ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme . . . [and] [a] court must therefore . . . fit, if possible, all parts into an harmonious whole . . . ." (internal quotation marks omitted)).[11]

### B. *Racial Classification Is Not Affected By "Other" Classifications*

My colleagues also think the statute is race-neutral because "section [8](a)(5)'s plain terms permit individuals of any race to be considered 'socially disadvantaged.' " *See* Maj. Op. at 9. Not so. Although a white business owner *can* qualify for the program, he nonetheless remains at a disadvantage in establishing his eligibility relative to a member of a racial minority group. Assume an admissions policy that sets quotas for "disadvantaged" students and also presumes that both black students and students whose socioeconomic level are below a certain threshold regardless of race are "disadvantaged." The policy plainly classifies on the basis of race; simply because it *also* classifies on a

---

[11] The majority's various criticisms of my reading, *e.g.*, that I "overlook[]" certain language, Maj. Op. at 15, and that I read "groups" to exclude "individual" experiences of discrimination, *id.* at 22–23, primarily reflect that I read the statute as a whole (including 2(f)) and my colleagues choose not to.

different, non-racial basis does not mean the race-based portions somehow become race-neutral. The same is true here. By designating members of certain racial minorities as socially disadvantaged, and using social disadvantage to separate out those who are presumed eligible to participate in the 8(a) program from those who must prove their eligibility, the Act classifies on the basis of race. *See* 15 U.S.C. §§ 631(f)(1)(B)–(C), 637(a)(5), (8).

For this reason, my colleagues' attempt to distinguish the relevant provisions of the Act from the admissions policy at issue in *Regents of the University of California v. Bakke*, 438 U.S. 265 (1978), is largely unavailing. *See* Maj. Op. at 8–9. The racial classification in *Bakke* was two-fold; the Medical School of the University of California at Davis set aside sixteen seats to be filled by "disadvantaged" students through a "special admissions program," 438 U.S. at 274–75, and the "special admissions program involve[d] a purposeful, acknowledged use of racial criteria," *id.* at 289 n.27. As the majority puts it, "an explicit factor in determining disadvantage was an applicant's race." Maj. Op. at 8 (citing *Bakke*, 438 U.S. at 274–75 & n.4). So, too, with the section 8(a) program. The Congress has ordered that certain contracts be set aside for "socially disadvantaged" individuals, 15 U.S.C. § 637(a), and has declared that members of certain *racial* groups are presumed to be socially disadvantaged, *id.* § 631(f)(1)(C). It cannot get much more "explicit" than that. *See* Maj. Op. at 8.

The only real difference between the program in *Bakke* and the 8(a) program is that, although whites could apply for admission through the "special admissions program" for "disadvantaged" students in *Bakke*, *see* 438 U.S at 274–76 & n.5, "[w]hite disadvantaged students were never considered" to be disadvantaged, *id.* at 281 n.14. In contrast, a white

business owner may be able to establish individual social disadvantage under the section 8(a) program, at least pursuant to the terms of the Act. *See* 15 U.S.C. § 637(a)(5). But the difference is immaterial. It makes little sense to say that the section 8(a) program is race-neutral because it only demotes non-minority applicants rather than locking them out entirely. Just as the *Bakke* program's "purposeful . . . use of racial criteria" in deciding who had access to certain medical-school seats drew "a line . . . on the basis of race and ethnic status," 438 U.S. at 289 & n.27, so too does the section 8(a) program's use of racial criteria in deciding who has automatic access to certain contracts.

The Supreme Court's decision in *Grutter v. Bollinger*, 539 U.S. 306 (2003), drives home the point. There, the University of Michigan Law School's admission policy "aspire[d] to achieve that diversity which has the potential to enrich everyone's education and thus make a law school class stronger than the sum of its parts." *Id.* at 315 (internal quotation marks omitted). The policy did not "define diversity solely in terms of racial and ethnic status"; rather, it "recognize[d] many possible bases for diversity admissions." *Id.* at 316 (internal quotation marks omitted). Nevertheless, because the law school specifically considered race as one measure of diversity, *id.*, thereby giving minority applicants an advantage in the admissions process, the Court subjected the policy to strict scrutiny, *see id.* at 326–27. Similarly, in the section 8(a) context, although social disadvantage can result without regard to race, race remains—by statute—a necessary part of the socially disadvantaged inquiry. *See* 15 U.S.C. § 637(a)(5), (8); *see also id.* § 631(f)(1)(B)–(C). That the program *allows* non-minority participation does not erase the race-based presumption contained therein and we must, accordingly, subject that presumption to strict scrutiny. *See, e.g.*, *Adarand Constructors, Inc. v. Pena*, 515 U.S. 213, 227

(1995) ("race-based rebuttable presumption" is racial classification that "must be analyzed by a reviewing court under strict scrutiny"); *see also Grutter* 539 U.S. at 322–26; *id.* at 323 ("[W]hen governmental decisions '*touch upon* an individual's race or ethnic background, he is entitled to a judicial determination that the burden he is asked to bear on that basis is precisely tailored to serve a compelling governmental interest.' " (emphasis added) (quoting *Bakke*, 438 U.S. at 299)).

    C.  *Section 8(a)'s Legislative History, Context and Case Law Do Not Support "No Racial Classification" Reading*

    Finally, I believe the majority's reading of the legislative history, statutory context and relevant case law does not support its conclusion that the relevant provisions of the Act are race neutral.

### 1. Legislative History

    The majority claims that the Congress's decision to strike a more explicit race-based presumption means that the statute as finally written lacks a racial classification. *See* Maj. Op. at 17–18. It makes hay of the Conference Committee's decision to endorse what appears to be a compromise between a rebuttable presumption in favor of Black Americans and Hispanic Americans originally adopted by the House,[12] *see*

---

[12] The presumption the House adopted read: "The [SBA] shall presume that socially and economically disadvantaged groups and group members include, but are not limited to, Black Americans and Hispanic Americans." H.R. 11318, 95th Cong. § 202 (1978), *available at* 124 CONG. REC. 7,529–30 (Mar. 20, 1978).

H.R. Rep. No. 95-949, at 16 (1978), and the provision the Senate adopted, directing the SBA to determine social disadvantage based on "whether the owner or owners of the applicant have been deprived of the opportunity to develop and maintain a competitive position in the economy due to cultural bias, general economic deprivation or other similar causes," S. Rep. No. 95-1070, at 37 (1978).

But the legislative history cuts both ways. In describing the amended language, the Conference Report makes plain that the trigger point is *membership* in a *group* that has experienced discrimination (and not exclusively individual discrimination): "The amendment . . . stat[es] that socially disadvantaged persons are those who have been subject to racial or ethnic prejudice or cultural bias (regardless of their individual qualities or personal attributes) *because* they have been identified as *a member of certain groups that have generally suffered from prejudice or bias*." H.R. Rep. No. 95-1714, at 21–22 (Conf. Rep.) (emphases added). "In other words," the Report goes on, "because of present and past discrimination many *minorities* have suffered social disadvantagement." *Id.* at 22 (emphasis added).

Moreover, reading sections 8(a)(5), 8(a)(8) and 2(f) to provide a race-based classification does not require concluding that the Congress must have enacted *sub silentio* what it had previously rejected, *see* Maj. Op. at 17–18. Under the original House provision, only Black Americans and Hispanic Americans were presumed to be socially disadvantaged; an individual who was not a member of one of these two groups had to show "impediments to establishing, maintaining, or expanding a small business concern which are not generally common in kind or degree to all small business persons and which result from both social and economic causes over which such individual has no control." H.R. Rep.

No. 95-949, at 24–25. The definition of social disadvantage ultimately enacted, however, is different—it focuses on "prejudice" or "bias" experienced because of group membership, 15 U.S.C. § 637(a)(5), not on business-specific impediments. Further, by using a definition of social disadvantage that allows for *both* group-based and individual-based showings of "racial or ethnic prejudice" or "cultural bias" (also naming a handful of socially disadvantaged groups, *id.* § 631(f)(1)(C), and authorizing the SBA to add others, *see id.* § 637(a)(8)), the Congress signaled to the SBA that racial minorities were not to be the *only* beneficiaries of the program. In discussing the changes to the House provision, the Congress went out of its way to make plain that "the Conferees realize that other Americans may also suffer from social disadvantagement because of cultural bias" and to offer the example of the "poor Appalachian white." *See* H.R. Rep. No. 95-1714, at 22 (Conf. Rep.). Notably, this is how the SBA came to understand "the legislative intent behind [the Act]: that *statutorily designated* racial and ethnic minorities be the primary beneficiaries of the 8(a) program, but that other disadvantaged individuals be eligible for the program." Definition of Social Disadvantage, 45 Fed. Reg. 79,413, 79,413 (Dec. 1, 1980) (emphasis added).

In addition, although the Act eliminated the House's explicit presumption, it *included* the House's findings—which formed the basis for the presumption in the first place—and rejected the Senate's—which did not list any racial groups. *See* H.R. Rep. No. 95-1714, at 21 (Conf. Rep.); *see also* S. Rep. No. 95-1070, at 36–37. Specifically, the Conference Committee noted that the House findings "establish the premise that many individuals are socially and economically disadvantaged as a result of being identified as members of certain groups, including but not limited to, black Americans and Hispanic Americans." H.R. Rep. No. 95-

1714, at 20 (Conf. Rep.). The Committee "adopt[ed] the House findings" and expanded the list to include Native Americans. *Id.* at 21. It also described the import of the House findings: "[I]n many, but not all, cases[,] *status as a minority can be directly and unequivocally correlated with social disadvantagement* and this condition exists regardless of the individual, personal qualities of that minority person." *Id.* (emphasis added). The legislative history thus confirms my reading of the statute's plain meaning—that the Congress understood its findings to designate certain *racial* groups as socially disadvantaged notwithstanding the fact that its definition of social disadvantage in section 8(a)(5) is open to members of non-racial but nonetheless minority groups (including whites who by location or otherwise are members of an ethnic/cultural minority).

One other piece of legislative history noticeably absent from the majority's analysis illustrates that the Congress's own views on how the statute operates are consistent with my own. When the Congress originally enacted section 2(f) of the Act in 1978, it recognized only "Black Americans, Hispanic Americans, [and] Native Americans" (along with the open-ended "other minorities") as groups that were socially disadvantaged. *See* Act of Oct. 24, 1978, Pub. L. 95-507, § 201, 92 Stat. 1757, 1760. Several months later, the SBA made an administrative finding that "Asian Pacific Americans" also comprised "a minority group which has members who are socially disadvantaged because of their identification as members of this group, for the purposes of eligibility for SBA's section 8(a) program." Designation of Eligibility Asian Pacific Americans Under Section 8(a) and 8(d) of the Small Business Act, 44 Fed. Reg. 42,832, 42,832 (July 20, 1979). At that time, the SBA had not yet promulgated the regulatory presumption designating certain groups as presumptively disadvantaged; rather, it listed the

statutorily-designated racial groups but it made disadvantage decisions on a "case-by-case" basis. *See* The Small Business and Capital Ownership Development Program, 44 Fed. Reg. 30,672, 30,674 (May 29, 1979). The administrative finding meant only that Asian Pacific Americans were added to the list of groups that had experienced discrimination. *See id.*

In 1980, however, the Congress added "Asian Pacific Americans" to the list of socially disadvantaged groups set out in section 2(f) of the Act. *See* Act of July 2, 1980, Pub. L. No. 96-302, § 118, 94 Stat. 833, 840. The legislative history of the 1980 Amendment is telling. A May 1980 House Small Business Committee Report states: "Present law specifies that, subject to certain specified constraints, 'socially disadvantaged' persons include 'black Americans, Hispanic Americans, native Americans and other minorities.' Therefore, these named groups *are afforded a presumption of 'social disadvantage.'* " H.R. Rep. No. 96-998, at 2 (1980) (emphases added). To repeat, at this point, the SBA had not yet promulgated any *regulatory* presumption of social disadvantage. *See* 44 Fed. Reg. at 30,674. The House Report goes on to state that the "bill would provide that Asian-Pacific Americans be afforded *the same presumption* of 'social disadvantage' as extended *under present law* to 'black Americans', 'Hispanic Americans', and 'native Americans'." H.R. Rep. No. 96-998, at 3 (emphases added). The Conference Report on the final legislation similarly states, "Present law specifies that, subject to certain specified constraints, 'socially disadvantaged' persons include 'Black Americans, Hispanic Americans, Native Americans and other minorities.' " H.R. Rep. No. 96-1087, at 35 (1980) (Conf. Rep.); *accord* S. Rep. No. 96-703, at 10 (1980) (Senate Select

Committee on Small Business report on Senate bill with virtually identical provision).[13]

It was on December 1, 1980—only after the legislation adding Asian Pacific Americans was enacted—that the SBA first updated its regulations—by way of an interim rule—to provide for a presumption in favor of the statutorily designated racial groups. *See* Definition of Social Disadvantage, 45 Fed. Reg. at 79,413–14. In doing so, it noted that "[s]ince Congress has found that Black Americans, Hispanic Americans, Native Americans, and, with the enactment of Pub. L. 96-302 on July 2, 1980, Asian Pacific Americans, are socially disadvantaged, members of those groups need not, as a general rule, present an individualized case of social disadvantage." *Id.* at 79,414. The history of the relevant legislation—as well as the regulations that follow it—conforms exactly to my reading. The Congress enacted a statutory presumption of social disadvantage for members of certain racial groups, acknowledged that presumption in adding Asian Pacific Americans to its list of groups and the SBA then followed suit in implementing that presumption through race-based regulations.

### 2. Statutory Context

The majority also claims that the Congress's use of a more "straightforward[]" racial presumption in section 8(d)(3) belies my reading of section 8(a). *See* Maj. Op. at 18–19.

---

[13] The majority apparently reads the SBA's initial 1979 regulation as set in amber, Maj. Op. at 13–14, because it gives no weight to the fact that, just one year later, the Congress itself, in adding Asian-Pacific Americans to the socially disadvantaged groups, intended those groups to be "presumed" socially disadvantaged, as the legislative history discussed above makes clear.

Because the Congress knows how to spell out an explicit presumption—as it did in section 8(d)(3)—a more explicit presumption in section 8(a) is also required. *See id.* I disagree. Whereas section 8(a) is a statutory directive to the SBA that sets forth an overall framework for eligibility in a government contract-preference program, *see* 15 U.S.C. § 637(a), section 8(d)(3) specifies contractual language the Congress requires federal agencies to use in an effort to ensure that prime contractors hire—as subcontractors—businesses owned by socially and economically disadvantaged individuals, *see id.* § 637(d)(3). Indeed, unlike section 8(a), which contemplates detailed implementation by the SBA, *see id.* § 637(a), section 8(d)(3)'s language is meant to be included automatically in each contract with no individual assessment—instead, it uses the SBA's section 8(a)(5) determinations, *see id.* § 637(d)(3)(C) ("The contractor shall presume that socially and economically disadvantaged individuals include . . . any other individual found to be disadvantaged by the [SBA] pursuant to section 8(a) of the Small Business Act."). Given the different contexts, that the Congress would use different language to further the same overall goal should come as no surprise. *See Deal v. United States*, 508 U.S. 129, 134 (1993) ("Congress sometimes uses slightly different language to convey the same message . . . ." (internal quotation marks omitted)).

Indeed, the majority's reading suggests the Congress sought to achieve *different* ends with these two provisions. The majority believes that, *via* section 8(a), the Congress wants the SBA to award prime contracts to small businesses based exclusively on the business owner's showing that he has personally experienced "prejudice" or "bias." *See* Maj. Op. at 8; *see also* 15 U.S.C. § 637(a)(5). But when it comes to awarding contracts to subcontractors, the Congress wants prime contractors to presume that members of certain

groups—the same groups listed in section 2(f) of the Act, no less—are socially disadvantaged with no individualized showing needed. *Id.* § 637(d)(3)(C). Why would the Congress want the government to award prime contracts using a different standard from the one it requires prime contractors to use in subcontracting? The majority offers no explanation. Mine, then, is the better reading—although the contractual provision uses different language, its eligibility inquiry program uses the racial classification provided in section 8(a).

### 3. Case Law

Finally, the majority asserts that "the Supreme Court and this court's discussions of the 8(a) program have identified the regulations—not the statute—as the source of its racial presumption." Maj. Op. at 20. The assertion is only partly true. Both the Supreme Court and this court have, like my colleagues, noted that the SBA's implementing regulations are race-based. *See Adarand*, 515 U.S. at 207; *DynaLantic*, 115 F.3d at 1013. But the Supreme Court has never held that the Act does not contain a racial classification, nor have we.

The statements the majority plucks from *Adarand* do not support any negative inference. The majority claims that "[i]n describing the 8(a) program, the *Adarand* Court explained that the agency (not Congress) presumes that certain racial groups are socially disadvantaged and cited an SBA regulation (not the statute)" for support; thus, in my colleagues' view, the Court must have meant that the Act does not classify on the basis of race. *See* Maj. Op. at 20–21. The smoking gun, it says, is the Court's use of the words "[t]he SBA presumes" in describing the relevant racial classification. *See id.* at 21 (quoting *Adarand*, 515 U.S. at 207). But other statements the Court makes in *Adarand* show

that it was not trying to distinguish between statute and regulation. For example, after explaining that "[t]he SBA presumes" social disadvantage for certain racial groups under the section 8(a) program, the Court declared that under the "8(d) subcontracting program," "*the SBA presumes* social disadvantage based on membership in certain minority groups" and the Court again cites to SBA *regulations*. *Adarand*, 515 U.S. at 207 (emphasis added). By the majority's logic, this must mean that it is the SBA regulations—and "not the statute," Maj. Op. at 20—that contain a racial classification under the 8(d) program. But, as discussed, *supra* at 23–24, my colleagues point to the statutory presumption in section 8(d) as the exemplar of a *statutory* race-based presumption. *See* Maj. Op. at 18–19. This illustrates a simple point—*Adarand*'s use of "the SBA presumes," 515 U.S. at 207, is irrelevant here. *Adarand,* which considered the entirety of the SBA programs at issue—including plainly race-based statutes and regulations—says precious little about whether the provisions of the Act applicable to the section 8(a) program contain a racial classification.

The same is true of *DynaLantic*. Although we plainly acknowledged that the regulations classify on the basis of race, *see* 115 F.3d at 1013, 1017, we did not hold that the statute does not. To the contrary, we were unwilling then to reach the conclusion that my colleagues now press, *i.e.*, that the statute is race-neutral. *See id.* at 1017. We labeled such an interpretation "rather dubious," *id.*, and noted that the statute "might *require* race-conscious regulations" based on the congressional findings in section 2(f). *Id.* at 1017 n.3 (emphasis in original). Indeed, the only portion of *DynaLantic* that supports my colleagues' reading is the dissent. *See id.* at 1019 (Edwards, J., dissenting) ("The legislation that creates the 8(a) set-aside does not define

social and economic disadvantage in terms of race."). But the dissent was a dissent for a reason—the majority was unconvinced by its reading of the statute. In sum, neither of the cases my colleagues put forward bolsters their view of the statute; *Adarand* offers no help and the majority's conclusion in *DynaLantic* supports my reading of the statute, not theirs.

\* \* \*

Although "[i]t is emphatically the province and duty of the judicial department to say what the law is," *Marbury v. Madison*, 5 U.S. 137, 177 (1803), we should not cast aside the consensus of those charged with drafting and implementing a particular statute without strong reasons for doing so. We are not *bound* by the parties' agreement that the statute includes a racial classification. *See supra* nn.1–2. Nor are we bound by the district court's interpretation, *see supra* n.3, or by the longstanding view of the SBA, *see supra* n.4. Nor, in this case, are we bound by our *DynaLantic* language; the determinative jurisdictional issue there did not require deciding whether the Act contains a racial classification. *See* 115 F.3d at 1017–18. But when such a chorus of voices rises in favor of a particular statutory interpretation, we should be slow to turn a deaf ear. In my view, the statutory language is plain and, for the reasons stated, the majority's defense of its alternative reading falls short of the mark. I would hold that the challenged portions of the Small Business Act include a racial classification and would therefore subject them to strict scrutiny.

Accordingly, I respectfully dissent.